[L.A. No. 31254. Aug. 7, 1980.]

In re the Marriage of BRENDA G. and GERALD E. LUCAS.
GERALD E. LUCAS, Appellant, v.
BRENDA G. LUCAS, Respondent.

COUNSEL

Daniel W. Grindle, Gade, Grindle & Haynie and Goodwin & Grindle for Appellant.

Robert T. Dierdorff for Respondent.

OPINION

MANUEL, J.—Gerald E. Lucas appeals from an interlocutory judgment dissolving his marriage to Brenda G. Lucas, awarding child custody, fixing spousal and child support and dividing property. Gerald contests only the trial court's determination of the parties' ownership interests in their residence and in a vehicle, both of which were purchased with a combination of community and separate funds. In this case we must resolve a conflict among the Courts of Appeal regarding the proper method of determining separate and community property interests in a single family dwelling acquired during the marriage with both separate property and community property funds.

Brenda and Gerald were married in March 1964 and lived together continuously until their separation in December 1976. At the time of their marriage Brenda was beneficiary of a trust. The trust corpus was distributed to her free of the trust in September 1964. She immediately established a revocable *inter vivos* trust of which she was trustor and beneficiary. The trust, conceded by Gerald to be Brenda's separate property, had a value of approximately $44,000 at the time of trial.

In November 1968, Brenda and Gerald bought a house for $23,300. Brenda used $6,351.57 from her trust for the down payment, and they assumed a loan of $16,948.43 for the balance of the purchase price. Title to the house was taken as "Gerald E. Lucas and Brenda G. Lucas, Husband and Wife as Joint Tenants." Brenda paid $2,962 from her trust funds for improvements to the property; the remainder of the expenses on the property was paid for with community funds. At the time

of trial the residence had a fair market value of approximately $56,250 and a loan balance of approximately $14,600, leaving a net equity of approximately $41,650. The community had reduced the principal by $2,052.32 and paid $6,801.14 in interest and $5,146.20 for taxes.

The trial court findings describe the parties' intent regarding ownership of the residence as follows: "The only discussions with regard to taking joint tenancy title to the property related to wife's understanding that title would pass to husband upon her death and that the children would benefit from this result; further, the parties contemplated that taking title in this manner would result in favorable tax consequences due to husband's veterans status. Wife did not intend to make a gift to the husband of any interest in the home purchased with her separate funds, nor did she know of any other legal significance of taking title to real property in the manner it was taken. Neither did husband intend to make a gift to wife of the payments made on the home from community funds during the period of ownership."

Brenda testified that she and Gerald did not discuss where the down payment would come from except to the extent that the payments would be higher if they did not use her trust fund and instead took a second trust deed on the house. Brenda said they had no agreement regarding the manner in which she would be disposing of the trust funds and that they did not discuss keeping the funds separate or using them to exhaust community debts. Brenda also testified that it was her intention at the time of the purchase to acquire the house for herself but that she did not discuss this with her husband.

In the interlocutory judgment entered in April 1978, the trial court deducted Brenda's $2,962 payment for improvements from the equity of $41,650.50 and then awarded a community property interest in the residence of 24.42 percent with a value of $9,477.50.[1] A separate property interest of 75.58 percent with a value of $29,241 was confirmed to Brenda.

The Courts of Appeal have taken conflicting approaches to the question of the proper method for determining the ownership interests in a residence purchased during the parties' marriage with both separate and community funds. In *In re Marriage of Bjornestad* (1974) 38 Cal.

---

[1] The amounts stated in the interlocutory judgment differ slightly from those stated in the findings. The figures given are those stated in the judgment.

App.3d 801 [113 Cal.Rptr. 576], the Court of Appeal allowed only reimbursement for separate property contributions to the down payment on the purchase of the parties' residence. In *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446 [152 Cal.Rptr. 668], the Court of Appeal developed a scheme of pro rata apportionment of the equity appreciation between the separate and community property contributions to the purchase price. The Court of Appeal in *In re Marriage of Trantafello* (1979) 94 Cal.App.3d 533 [156 Cal.Rptr. 556], however, held that the residence was entirely community in nature in the absence of any evidence of an agreement or understanding between the parties to the contrary.

The beginning point of analysis in each case was the nature of title taken by the parties. In *Bjornestad* and *Trantafello*, title was taken by husband and wife as joint tenants; in *Aufmuth*, it was taken as community property. Until modified by statute in 1965, there was a rebuttable presumption that the ownership interest in property was as stated in the title to it. (*Machado* v. *Machado* (1962) 58 Cal.2d 501 [25 Cal.Rptr. 87, 375 P.2d 55]; *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202 [259 P.2d 656]; *Socol* v. *King* (1950) 36 Cal.2d 342 [223 P.2d 627]; *Tomaier* v. *Tomaier* (1944) 23 Cal.2d 754 [146 P.2d 905].) Thus a residence purchased with community funds, but held by a husband and wife as joint tenants, was presumed to be separate property in which each spouse had a half interest. (See *Socol* v. *King, supra*, 36 Cal.2d at pp. 345-347.) The presumption arising from the form of title could be overcome by evidence of an agreement or understanding between the parties that the interests were to be otherwise. (*Ibid.*; *Gudelj* v. *Gudelj, supra*, 41 Cal.2d at p. 212; *Machado* v. *Machado, supra*, 58 Cal.2d at p. 506.) It could not be overcome, however, "solely by evidence as to the source of the funds used to purchase the property." (*Gudelj* v. *Gudelj, supra*, 41 Cal.2d at p. 212.) Nor could it "be overcome by testimony of a hidden intention not disclosed to the other grantee at the time of the execution of the conveyance." (*Ibid*; *Socol* v. *King, supra*, 36 Cal.2d at p. 346; *Machado* v. *Machado, supra*, 58 Cal.2d at p. 506.)

The presumption arising from the form of title created problems upon divorce or separation when title to the parties' residence was held in joint tenancy. (Review of Selected 1965 Code Legislation (Cont. Ed. Bar) p. 40; Final Rep. of Assem. Interim Com. on Judiciary Relating to Domestic Relations (1965) pp. 121-122, 2 Appen. to Assem. J. (1965 Reg. Sess.) hereafter referred to as Domestic Relations Rep.) Unless the presumption of separate property created by the form of title could

be overcome by evidence of a common understanding or agreement to the contrary, a house so held could not be awarded to the wife as a family residence for her and the children. (*Ibid.*) In 1965 the Legislature considered various proposals to remedy this problem. The Legislature also noted that "husbands and wives take property in joint tenancy without legal counsel but primarily because deeds prepared by real estate brokers, escrow companies and by title companies are usually presented to the parties in joint tenancy form. The result is that they don't know what joint tenancy is, that they think it is community property, and then find out upon death or divorce that they didn't have what they thought they had all along and instead have something else which isn't what they had intended." (Domestic Relations Rep., p. 124.)

In 1965, in an attempt to solve these problems, the Legislature added the following provision to Civil Code section 164: "[W]hen a single family residence of a husband and wife is acquired by them during marriage as joint tenants, for the purpose of the division of such property upon divorce or separate maintenance only, the presumption is that such single family residence is the community property of said husband and wife." (Stats. 1965, ch. 1710, p. 3843; see now Civ. Code § 5110.)[2] The effect of this provision was to change the presumptive form of ownership to that more closely matching the intent and assumptions of most spouses who acquire and hold their residence in joint tenancy. (Review of Selected 1965 Code Legislation (Cont.Ed.Bar) pp. 40-41; Domestic Relations Rep., pp. 124-125.) There is no indication that the Legislature intended in any way to change the rules regarding the strength and type of evidence necessary to overcome the presumption arising from the form of title. (See Domestic Relations Rep., p. 124.)

■ The presumption arising from the form of title is to be distinguished from the general presumption set forth in Civil Code section 5110 that property acquired during marriage is community property. It is the affirmative act of specifying a form of ownership in the convey-

---

[2]Section 164 was repealed in 1969 in connection with the enactment of the Family Law Act. (Stats. 1969, ch. 1608, § 3, p. 3313.) It was replaced by section 5110 which contains an almost identical provision: "When a single-family residence of a husband and wife is acquired by them during marriage as joint tenants, for the purpose of the division of such property upon dissolution of marriage or legal separation only, the presumption is that such single-family residence is the community property of the husband and wife."

Although section 164 was the applicable statute when the parties in this case purchased their house, as a matter of convenience, future references in this opinion will be to the current statute, section 5110.

ance of title that removes such property from the more general presumption. (See *Socol v. King, supra,* 36 Cal.2d at p. 346.) It is because of this express designation of ownership that a greater showing is necessary to overcome the presumption arising therefrom than is necessary to overcome the more general presumption that property acquired during marriage is community property. In the latter situation, where there is no written indication of ownership interests as between the spouses, the general presumption of community property may be overcome simply by tracing the source of funds used to acquire the property to separate property. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 608-612 [122 Cal.Rptr. 79, 536 P.2d 479]; *Estate of Murphy* (1976) 15 Cal.3d 907, 917-919 [126 Cal.Rptr. 820, 544 P.2d 956]; *See v. See* (1966) 64 Cal.2d 778, 783 [51 Cal.Rptr. 888, 415 P.2d 776].) It is not necessary to show that the spouses understood or intended that property traceable to separate property should remain separate.

The rule requiring an understanding or agreement comes into play when the issue is whether the presumption arising from the form of title has been overcome. It is supported by sound policy considerations, and we decline to depart from it. To allow a lesser showing could result in unfairness to the spouse who has not made the separate property contribution. Unless the latter knows that the spouse contributing the separate property expects to be reimbursed or to acquire a separate property interest, he or she has no opportunity to attempt to preserve the joint ownership of the property by making other financing arrangements. The act of taking title in a joint and equal ownership form is inconsistent with an intention to preserve a separate property interest. Accordingly, the expectations of parties who take title jointly are best protected by presuming that the specified ownership interest is intended in the absence of an agreement or understanding to the contrary. We therefore resolve the conflict in Court of Appeal opinions by following *Trantafello* and disapproving *Aufmuth* and *Bjornestad* to the extent they are inconsistent with this opinion.

In the present case there is no evidence of an agreement or understanding that Brenda was to retain a separate property interest in the house. Nor is there any finding by the trial court on the question. The only findings in this regard are that neither party intended a gift to the other. Such evidence and findings are insufficient to rebut the presumption arising from title set forth in Civil Code section 5110. The trial court's determination must therefore be reversed.

Neither the parties nor the court applied the correct rules to this case, and it is possible that had they done so the proof might have been different. In the interest of justice, therefore, the matter of the community or separate property character of the residence must be remanded for reconsideration in light of these rules.

If on reconsideration the house is found to be entirely community in nature, Brenda would also be barred from reimbursement for the separate property funds she contributed in the absence of an agreement therefor. ■ It is a well-settled rule that a "party who uses his separate property for community purposes is entitled to reimbursement from the community or separate property of the other only if there is an agreement between the parties to that effect." (*See* v. *See, supra,* 64 Cal.2d at p. 785; *Weinberg* v. *Weinberg* (1967) 67 Cal.2d 557, 570 [63 Cal.Rptr. 13, 432 P.2d 709]; *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 82-86 [154 Cal.Rptr. 413, 592 P.2d 1165].) While the parties are married and living together it is presumed that, "unless an agreement between the parties specifies that the contributing party be reimbursed, a party who utilizes his separate property for community purposes intends a gift to the community." (*In re Marriage of Epstein, supra,* 24 Cal.3d at p. 82.)

■ For guidance in the event that on reconsideration the court finds there was an understanding or agreement that Brenda was to retain a separate property interest in the residence, we discuss briefly the question of the proper method of calculating the community and separate interests. In these inflationary times when residential housing is undergoing enormous and rapid appreciation in value, we believe that the most equitable method of calculating the separate and community interests when the down payment was made with separate funds and the loan was based on a community or joint obligation is that set forth by Justice McGuire in *In re Marriage of Aufmuth, supra,* 89 Cal.App.3d at pages 456-457. In brief, the *Aufmuth* formula gives the spouse who made the separate property down payment a separate property interest in the residence in the proportion that the down payment bears to the purchase price; the community acquires that percentage of the residence which the community loan bears to the purchase price.[3]

---

[3]The value of those interests is computed by first determining the amount of capital appreciation, which is computed by subtracting the purchase price from the fair market value of the residence. The separate property interest would be determined by adding the amount of capital appreciation attributable to separate funds to the amount of equity paid by separate funds. The community interest would be the amount of capital

If the trial court finds no agreement or understanding that Brenda was to retain a separate property interest in the residence, Brenda's contribution of $2,962 of separate funds for improvements should have no effect on the determination of the parties' interests, and the presumption of section 5110 is controlling. (*See v. See, supra*, 64 Cal.2d at p. 783.) If there was an understanding that Brenda's separate interest should be maintained, but no separate understanding with respect to improvements, Brenda should receive no additional credit for her expenditure for improvements, for it may be presumed that she intended that they redound to both the community and her separate interest in the property. (Cf., *See v. See, supra*, 64 Cal.2d at p. 785.)

■ Gerald also challenges the trial court's determination that a 1976 Harvest Mini-Motorhome, purchased in January 1976 for a cash price of $10,388, was Brenda's separate property. A community property vehicle was traded in on the purchase for an allowance of $2,567. An additional cash payment of $100 was made on the purchase from community funds. The cost of insurance and license fees ($474) added to the cash price of the motorhome, less the trade-in allowance and cash down payment, left a total unpaid balance of $8,195. That sum was paid by check drawn on Brenda's separate checking account. The community contributed 24.6 percent of the cost and Brenda contributed 75.4 percent of the cost of the vehicle. The fair market value of it at the time of trial was $9,000.

The purchase contract was made out in the name of Gerald alone, but title and registration were taken in Brenda's name only. Brenda wished to have title in her name alone, and Gerald did not object. The

---

appreciation attributable to community funds plus the amount of equity paid by community funds; the amount of equity paid by community funds is represented by the amount by which the principal balance on the loan has been reduced.

These principles may be exemplified by considering a house purchased for $100,000, with the wife paying the entire down payment of $20,000 from separate property funds and the community contributing the rest of the purchase price in the amount of a loan for $80,000. There would be a 20 percent separate property interest and an 80 percent community property interest in the house. Assume that the fair market value of the house at the time of trial is $175,000, resulting in a capital appreciation of $75,000, and the mortgage balance at the time of separation was $78,000. The value of the separate property interest would be $35,000, which represents the amount of capital appreciation attributable to the separate funds (20 percent of $75,000) added to the amount of equity paid by separate funds ($20,000). The net value of the community property interest would be $62,000, which represents the amount of capital appreciation attributable to community funds (80 percent of $75,000) added to the amount of equity paid by community funds ($80,000 minus $78,000).

motorhome was purchased for family use and was referred to and used by the parties as a "family vehicle."

The trial court confirmed the motorhome to Brenda as her separate property. The interlocutory judgment stated that Gerald "had a de minimus community property interest therein which was made a gift to respondent [Brenda] at the time of the purchase."

Contrary to Gerald's contention, the trial court's determination that he made a gift of his interest is supported by substantial evidence. Title was taken in Brenda's name alone. Gerald was aware of this and did not object. This evidence constitutes substantial support for the trial court's conclusion that Gerald was making a gift to Brenda of his community property interest in the motorhome. (See *In re Marriage of Frapwell* (1975) 49 Cal.App.3d 597, 600-601 [122 Cal.Rptr. 718].)

The judgment is reversed insofar as it determines the respective interests of the parties in the residence and divides the community property.

It is affirmed in all other respects.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Newman, J., concurred.