[Civ. No. 45594. First Dist., Div. Two. Mar. 5, 1981.]

In re the Marriage of MARIA ELIZABETH and
SAMUEL SEBASTIAN GONZALES.
SAMUEL SEBASTIAN GONZALES, Appellant, v.
MARIA ELIZABETH GONZALES, Appellant.

COUNSEL

Ross, Hackett & Segall and Gordon W. Hackett for Appellant Husband.

Sandra Blair, Joanne Schulman and Blair & LeGrand for Appellant Wife.

OPINION

**TAYLOR, P. J.**—Samuel Sebastian Gonzales appeals from the portions of the interlocutory judgment of dissolution of marriage which charac-

terize the family residence as 41.4 percent community property and 58.6 percent wife's separate property and which distribute the interests in said real property. Maria Elizabeth Gonzales cross-appeals from the portions of the interlocutory judgment whereby the court reserves jurisdiction over husband's civil service retirement benefits and jurisdiction over the family residence. We discuss each of the parties' contentions, noting however, that this court has the benefit of recent appellate decisions which were not available to the trial court at the time the interlocutory judgment was entered.

The parties were married July 2, 1966, and separated November 24, 1976. There are two minor children of this marriage. Maria's mother died suddenly, and her father came to live with the family. The couple, Maria's father, the children, and Maria's child by a former marriage all lived in a four-room flat. Living conditions were unsatisfactory, and Maria's father told her to go buy a house. In April 1971 the real property in question was purchased for $29,500. At the time of purchase, a total of $9,186.89 was paid, including down payment and closing costs, and a loan in the amount of $21,500 was taken with Homestead Savings and Loan Association. The $9,186.89 paid on the property at the time of purchase was provided by Mr. Goodwin, Maria's father, and was paid directly to the escrow holder. Title to the property was taken in the names of Samuel and Maria, husband and wife as joint tenants. Mr. Goodwin was expressly asked whether he wanted his name on the deed. Samuel testified that his father-in-law told him to put the deed in his, Samuel's name, and Maria's name, and that he never told Samuel the house was a gift to Maria or to anyone else. Maria testified that she and Samuel had discussed in what form title to the house would be taken and whose names would be on the title. Although she did not remember her father saying that he wanted the house to be in her name and that of Samuel's, she stated he may have done so. She did remember him telling her, however, that she "could do what [she] wanted." Maria testified: "Well, my father didn't want his name on it, and I felt that it shouldn't be in one person's name only. So it ended up being in both our names." Mr. Goodwin was not called to the stand.

Both Samuel and Maria testified that at the time the property was purchased, Maria's father was living with them, and they understood and assumed that Mr. Goodwin would continue to live with them and spend the rest of his life in the residence which the parties purchased. Maria stated that she saw her father as her responsibility since he had no one else, and that she had promised her father he could always live

with her. He was not, however, living with her on the date of the hearing.

A few months after Maria and Samuel acquired the house, Mr. Goodwin gave Maria $5,375 so that the monthly mortgage payments would be lowered. This lump sum payment was applied directly to the mortgage by Mr. Goodwin who made payment directly to the mortgagee. After the purchase of the property, Mr. Goodwin also purchased materials for the renovation and improvement of the house in the amount of $6,000. Payment for these materials was made directly to the suppliers by Mr. Goodwin. Thus, Maria's father contributed $20,561.89 toward the purchase and improvement of the property. The market value of the residence at time of trial was $90,000; the balance due on the mortgage was $13,000; and the parties' equity was $77,000.

At the conclusion of the hearing, the court stated: "So, with regard to the house, I did not find that the contributions of Mr. Goodwin represented gifts to both parties, and further find that the mere placing of the house in joint tenancy, given current date, financing requirements, which I think you will find if there had been an effort to put the house in the name of one party, the savings and loan would not have allowed it, whether the parties made that determination or not. But as a practical matter, that's true. [¶] So, I don't find that there is a [*sic*] sufficient evidence upon which to establish that there was a gift to both parties." Following this statement and based on the premise of Maria providing a home for her father, the trial court found that Mr. Goodwin's contributions were contributions to Maria alone.

The interlocutory judgment entered January 5, 1978, distributes the real property "to the parties as tenants in common, [Samuel] to hold 20.7%...and [Maria] to hold 79.3% as...sole and separate property. [Maria] is awarded the sole right to the use and possession of the premises as between the two parties." The judgment also provides: "Unless sooner modified in accordance with this order, the parties shall offer the property for sale on April 29, 1988, when the youngest child of the parties shall attain the age of eighteen (18)...."

*The community and separate property interests in the residence.*

Samuel contends that "there was insufficient evidence to find the contributions of Mr. Goodwin to be gifts to [Maria] alone." The finding of a trial court that property is either separate or communi-

ty in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences. (*Beam* v. *Bank of America* (1971) 6 Cal.3d 12, 25 [98 Cal.Rptr. 137, 490 P.2d 257].)

■ We turn then to an examination of the facts before us in light of two recent decisions of our Supreme Court authored by the late beloved Manuel, J., *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285] and *In re Marriage of Moore* (1980) 28 Cal.3d 366 [168 Cal.Rptr. 662, 618 P.2d 208].

In *Lucas*, the husband contested the trial court's determination of the parties' ownership interests in their residence and a motor home. Brenda and Gerald were married in March 1964. At that time Brenda was the beneficiary of a trust which was distributed to her in September 1964. In November 1968, they bought a house for $23,300. Brenda used $6,351.57 from her trust for the down payment, and they assumed a loan of $16,948.43 for the balance of the purchase price. Title to the property was taken as "Gerald E. Lucas and Brenda G. Lucas, husband and wife as Joint Tenants." Brenda paid $2,962 from her trust funds for improvements to the property; the remainder of the expenses on the property was paid for with community funds. At the time of trial, the residence had a fair market value of approximately $56,250 and a loan balance of approximately $14,600, leaving a net equity of approximately $41,650. The community had reduced the principal by $2,052.32 and paid $6,801.14 in interest and $5,146.20 for taxes.

"The trial court findings describe the parties' intent regarding ownership of the residence as follows: 'The only discussions with regard to taking joint tenancy title to the property related to wife's understanding that title would pass to husband upon her death and that the children would benefit from this result; further, the parties contemplated that taking title in this manner would result in favorable tax consequences due to husband's veterans status. Wife did not intend to make a gift to the husband of any interest in the home purchased with her separate funds, nor did she know of any other legal significance of taking title to real property in the manner it was taken. Neither did husband intend to make a gift to wife of the payments made on the home from community funds during the period of ownership.'

"Brenda testified that she and Gerald did not discuss where the down payment would come from except to the extent that the payments

would be higher if they did not use her trust fund and instead took a second trust deed on the house. Brenda said they had no agreement regarding the manner in which she would be disposing of the trust funds and that they did not discuss keeping the funds separate or using them to exhaust community debts. Brenda also testified that it was her intention at the time of the purchase to acquire the house for herself but that she did not discuss this with her husband.

"In the interlocutory judgment entered in April 1978, the trial court deducted Brenda's $2,962 payment for improvements from the equity of $41,650.50 and then awarded a community property interest in the residence of 24.42 percent with a value of $9,477.50. A separate property interest of 75.58 percent with a value of $29,241 was confirmed to Brenda." (*In re Marriage of Lucas, supra*, 27 Cal.3d at p. 812, fn. omitted.)

Manuel, J., traced the conflicting approaches to determining separate and community interests. He then stated, at pages 814-816: "In 1965, in an attempt to solve these problems, the Legislature added the following provision to Civil Code section 164: '[W]hen a single family residence of a husband and wife is acquired by them during marriage as joint tenants, for the purpose of the division of such property upon divorce or separate maintenance only, the presumption is that such single family residence is the community property of said husband and wife.' (Stats. 1965, ch. 1710, p. 3843; see now Civ. Code § 5110.)[2] The effect of this provision was to change the presumptive form of ownership to that more closely matching the intent and assumptions of most spouses who acquire and hold their residence in joint tenancy. (Review of Selected 1965 Code Legislation (Cont.Ed.Bar) pp. 40-41; Domestic Relations Rep., pp. 124-125.) There is no indication that the Legislature intended in any way to change the rules regarding the strength and type of evidence necessary to overcome the presumption arising from the form of title. (See Domestic Relations Rep., p. 124.)

---

"[2]Section 164 was repealed in 1969 in connection with the enactment of the Family Law Act. (Stats. 1969, ch. 1608, § 3, p. 3313.) It was replaced by section 5110 which contains an almost identical provision: 'When a single-family residence of a husband and wife is acquired by them during marriage as joint tenants, for the purpose of the division of such property upon dissolution of marriage or legal separation only, the presumption is that such single-family residence is the community property of the husband and wife.'

"Although section 164 was the applicable statute when the parties in this case purchased their house, as a matter of convenience, future references in this opinion will be to the current statute, section 5110."

"The presumption arising from the form of title is to be distinguished from the general presumption set forth in Civil Code section 5110 that property acquired during marriage is community property. It is the affirmative act of specifying a form of ownership in the conveyance of title that removes such property from the more general presumption. (See *Socol* v. *King, supra,* 36 Cal.2d [342] at p. 346 [223 P.2d 627].) It is because of this express designation of ownership that a greater showing is necessary to overcome the presumption arising therefrom than is necessary to overcome the more general presumption that property acquired during marriage is community property. In the latter situation, where there is no written indication of ownership interests as between the spouses, the general presumption of community property may be overcome simply by tracing the source of funds used to acquire the property to separate property. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 608-612 [122 Cal.Rptr. 79, 536 P.2d 479]; *Estate of Murphy* (1976) 15 Cal.3d 907, 917-919 [126 Cal.Rptr. 820, 544 P.2d 956]; *See* v. *See* (1966) 64 Cal.2d 778, 783 [51 Cal.Rptr. 888, 415 P.2d 776].) It is not necessary to show that the spouses understood or intended that property traceable to separate property should remain separate.

"The rule requiring an understanding or agreement comes into play when the issue is whether the presumption arising from the form of title has been overcome. It is supported by sound policy considerations, and we decline to depart from it. To allow a lesser showing could result in unfairness to the spouse who has not made the separate property contribution. Unless the latter knows that the spouse contributing the separate property expects to be reimbursed or to acquire a separate property interest, he or she has no opportunity to attempt to preserve the joint ownership of the property by making other financing arrangements. The act of taking title in a joint and equal ownership form is inconsistent with an intention to preserve a separate property interest. Accordingly, the expectations of parties who take title jointly are best protected by presuming that the specified ownership interest is intended in the absence of an agreement or understanding to the contrary. . . .

"In the present case there is no evidence of an agreement or understanding that Brenda was to retain a separate property interest in the house. Nor is there any finding by the trial court on the question. The only findings in this regard are that neither party intended a gift to the other. Such evidence and findings are insufficient to rebut the presumption arising from title set forth in Civil Code section 5110. The trial court's determination must therefore be reversed.

"Neither the parties nor the court applied the correct rules to this case, and it is possible that had they done so the proof might have been different. In the interest of justice, therefore, the matter of the community or separate property character of the residence must be remanded for reconsideration in light of these rules."

*Lucas* also points out that if, on reconsideration, the house is found to be entirely community in nature, Brenda would also be barred from reimbursement for the separate property funds she contributed in the absence of an agreement therefor. (27 Cal.3d at p. 816.)

*In re Marriage of Moore, supra,* 28 Cal.3d 366 rejected husband's contention that the community property interest in a residence purchased by wife before marriage should be based on the full amounts of the community payments made, including interest, taxes and insurance, rather than only the amount by which the payments reduced the principal. The court held that because such expenditures did not increase the equity value of the property, they should not be considered in its division on dissolution of marriage. (At pp. 371-374.)

In the instant case, following Maria's discussion with Samuel and her father with respect to the manner in which title would be taken and as a result of her own choice, title was taken in joint tenancy; the record is devoid of any evidence that Maria enunciated an intention to retain a separate property interest in the residence; and Mr. Goodwin did not testify. Thus, the presumption of Civil Code section 5110 has not been rebutted, and the residence must be deemed community property. The case is thus clearly distinguishable from *In re Marriage of Camire* (1980) 105 Cal.App.3d 859 [164 Cal.Rptr. 677], where, although the spouses had acquired the marital residence by quitclaim deed as joint tenants during the marriage, the court determined that the property was actually a gift to the wife from her brother and thus separate in character. In *Camire,* there was specific testimony of the wife's brother that he had told the husband of his intention to give the house to the wife when the deed was executed, which testimony the court held rebutted the presumption created by Civil Code section 5110.

A few months after title to the marital residence was taken in joint tenancy, and after discussions "about what form [they] had put the title in," Mr. Goodwin paid an additional $5,375 to the mortgagee "so that the monthly payments would be lowered." In view of our holding that the residence must be deemed community property, and in the absence

of any evidence of an announced retention of a separate property interest, we conclude that this payment must also be treated as community property.

Since the residence must be deemed to be the community property of the parties, Maria is barred from reimbursement for the separate property funds contributed for the renovations. (*In re Marriage of Lucas, supra*, 27 Cal.3d at p. 816.)

*The award of the real property as tenants in common.*

Samuel contends that the cotenancy order does not constitute an equal division of the community property and is improper as an award of additional child support. There is no doubt from the court's explanation at the conclusion of the hearing that it awarded the family home to wife because economically, based on its then determination of the respective property interests, and environmentally, it felt it was best for her and the children. While Samuel's interest in the property was not offset by a promissory note or the assignment of other assets to him, Maria was obligated to incur the expenses for mortgage payments, taxes, insurance and normal maintenance. The trial court felt that with the disproportionate ownership, the value of wife's payments "would constitute a reasonable rental value of the property" with the effect that wife would be renting the property from herself and her husband.

Civil Code section 4800, subdivision (b)(1), provides: "Notwithstanding subdivision (a), the court may divide the community property . . . of the parties as follows: (1) Where economic circumstances warrant, the court may award any asset to one party on such conditions as it deems proper to effect a substantially equal division of the property." ■ The language found in *In re Marriage of Emmett* (1980) 109 Cal.App. 3d 753, 759 [169 Cal.Rptr. 473], is here pertinent: "[T]here is no hard and fast rule which the trial court is unequivocally required to follow in every case with reference to the method of dividing the community property of the parties pursuant to Civil Code section 4800. Rather the trial court should exercise its reasonable discretion in determining how the equal division of the assets should be accomplished. . . . [¶] Nothing in the language of Civil Code section 4800 requires a distribution of the community property *in kind*. The mandate of that section is that the community property must generally be divided equally. An equal division is not necessarily equated with a division in kind." (Original italics.)

In light of our conclusion that the marital residence is community property and the respective interest of each party is substantially altered, and in light of events which may have occurred subsequent to the original determination, upon remand, the trial court may wish to reexamine the award of the residence as tenants in common.

*Samuel's retirement.*

At the time of trial, Samuel was 52 years old. He was employed by the federal government from 1947 to 1962, and rehired in 1966. He had accumulated 26 years of service credit towards retirement benefits under the United States Civil Service Retirement System. When Samuel terminated his employment in 1962, he withdrew his contributions to the retirement plan; however, he still receives service credit for those years in establishing his eligibility for retirement. He must redeposit the refunded contributions, plus interest, in order to have those years credited in computing the annuity payable on retirement and had filed an application to redeposit the withdrawn contributions.

Maria contends that "the trial court's reservation of jurisdiction and refusal to ascertain and divide the community interest in [Samuel's] retirement benefits was improper and unreasonable." (See *In re Marriage of Marx* (1979) 97 Cal.App.3d 552 [159 Cal.Rptr. 215], hg. den.; *In re Marriage of Samuels* (1979) 96 Cal.App.3d 122 [158 Cal.Rptr. 38], hg. den.; *In re Marriage of Kasper* (1978) 83 Cal.App. 3d 388 [147 Cal.Rptr. 821], hg. den.) *In re Marriage of Freiberg* (1976) 57 Cal.App.3d 304, 312 [127 Cal.Rptr. 792], states: "In the event the court divides retirement rights by awarding each spouse a share in future payments under the retirement plan, it may retain jurisdiction to supervise the payment of these benefits [citation]. [¶] As a general rule, in selecting a method to effect distribution of the community interest in retirement rights the court acts in the exercise of judicial discretion and its determination respecting such will not be interfered with on appeal unless an abuse of discretion is shown. The criterion governing judicial action is reasonableness under the circumstances. The method adopted may vary with the facts in each case." (See also *In re Marriage of Emmett, supra,* 109 Cal.App.3d at pp. 757-759.)

Maria indicated in the trial court that she would like to offset the community property pension rights with the community property portion of the residence. The trial court declined to do so. While we ob-

serve that Maria has failed to demonstrate an abuse of judicial discretion in the reservation of jurisdiction over Samuel's retirement, and we refuse to comment on whether a residence in hand is equivalent to a future pension, we feel confident the trial court will divide the community property in accordance with the statutory prescription on remand.

*The "cohabitation" restriction.*

The interlocutory judgment provides, inter alia: "The court retains jurisdiction of the property in all regards for the purpose of modifying this order on a change of circumstances from those existing at the time of trial, including, but not limited to...[Maria] living with a male adult other than [Samuel] on the premises...." Maria argues that the cited provision "violates [her] constitutional rights of privacy, equal protection and association, and must be stricken from the order." Samuel argues contra, and claims Maria's argument is premature in that it is one circumstance which might warrant modification, and if the court did nothing, Maria's rights would not be violated.

Cohabitation with an individual of the opposite sex may be a ground for reduction in spousal support (Civ. Code, § 4801.5), and may be "relevant in deciding a custody dispute, where there is compelling evidence that such conduct has significant bearing upon the welfare of the children objectively defined." (*In re Marriage of Wellman* (1980) 104 Cal.App.3d 992, 999 [164 Cal.Rptr. 148]; see Civ. Code, §§ 4351, 4600.) The provision here can be distinguished from the lease agreement found in *Atkisson v. Kern County Housing Authority* (1976) 59 Cal.App.3d 89 [130 Cal.Rptr. 375] which the court held created an irrebuttable presumption. It is important to note, however, that Civil Code section 4800, subdivision (b)(1), *supra*, authorizes the court to award any asset to one party under certain conditions *where economic circumstances* warrant. *In re Marriage of Duke* (1980) 101 Cal.App.3d 152, 155-159 [161 Cal.Rptr. 444], holds that "[w]*here adverse economic, emotional and social impacts on minor children and the custodial parent which would result from an immediate loss of a long established family home are not outweighed by economic detriment to the noncustodial party, the court shall, upon request, reserve jurisdiction and defer sale on appropriate conditions.*" (Original italics.) *Duke* notes that "reservation of jurisdiction need not rest solely on an economic support basis" (*Id.*, at p. 157); nevertheless cohabitation is nowhere expressed or implied as a factor triggering change of circum-

stances and thus must be considered solely within the "economic circumstances" mandate of the statute.

The judgment is reversed insofar as it determines the respective interests of the parties in the residence and its use and divides the community property. It is affirmed in all other respects. Each party is to bear his or her own costs and attorney's fees on appeal.

Rouse, J., and Smith, J., concurred.