[No. A039295. First Dist., Div. Three. Sept. 30, 1988.]

In re the Marriage of LENA J. and ORLANDO M. CAIRO.
LENA J. CAIRO, Respondent, v.
ORLANDO M. CAIRO, Appellant.

1256

**COUNSEL**

Ruth Downs Sullivan for Appellant.

Joseph M. Neri for Respondent.

**OPINION**

**BARRY-DEAL, J.**—Orlando M. Cairo appeals from portions of a judgment entered in a dissolution proceeding (1) characterizing a parcel of real

property as community and awarding half the proceeds of its sale to each party, and (2) assigning to husband certain credit card debts. The principal question in this appeal is the applicability of Civil Code section 4800.2. We hold that section 4800.2 cannot constitutionally be applied to property acquired before January 1, 1984, even if the petition for dissolution was filed after that date and judgment entered after January 1, 1987.[1]

### Facts and Trial Court's Findings

Orlando M. Cairo (husband) and Lena J. Cairo (wife) were married in November 1954; they separated February 10, 1986, after over 31 years of marriage.

In August 1975, husband inherited $108,000. On August 21 of that year, the money was deposited in a Bank of America account in the names of both husband and wife. Wife occasionally withdrew money from that account to pay household expenses. Without informing wife, in early 1976, husband withdrew the balance remaining in the account, approximately $85,606, and deposited those funds in a new Bank of America account in his name alone. Wife learned that the joint account had been closed when she tried to make a withdrawal; when she asked husband why he had closed the account, he simply said that he wanted to.

In early 1977, husband used more than $35,000 from the new Bank of America account to make a down payment on a parcel of real property located at 2491 San Bruno Avenue (the San Bruno property). That property was being sold by the executrix of a probate estate, and the record includes a deed conveying the property from the executrix to husband, "a married man." Wife testified that she and husband went to look at the property and were both enthused about the purchase.

The total purchase price was $71,000, and financing was obtained through Bank of America. Wife testified that she went at husband's request to that bank to sign some papers for the loan. She became upset, however, when she discovered that her name was not on the documents. "[T]hey were taking me off the property." She refused to sign the documents and left the bank.[2]

Husband later told wife he had made a mistake; he said he had new papers for her to sign, to put her name on the property. He brought some papers home from the bank for her to sign regarding the financing. On

---

[1] Unless otherwise indicated, all statutory references are to the Civil Code.

[2] Husband denied that wife ever refused to sign any of the papers.

May 24, 1977, he picked her up on her lunch hour and took her to the title company. There she executed a grant deed in which "ORLANDO MARIO CAIRO and LENA J. CAIRO, his wife," granted the property to "ORLANDO MARIO CAIRO and LENA J. CAIRO, who are married to each other, as JOINT TENANTS." At the same time, she also signed other documents, but testified that she did not know what they were. Because she was on her lunch hour and in a hurry, she did not read all the documents. As soon as she saw the deed with her name on it, she asked no questions; she signed as instructed. Neither party was represented by an attorney during this transaction.

The May 1977 buyer's instructions to the title insurance company indicated that title would vest in husband and wife as joint tenants. A disclosure statement required to secure financing designated wife as a coborrower. However, the deed of trust securing the loan from Bank of America included a provision initialed by wife which states in pertinent part that she "voluntarily and unequivocally disclaim[ed] any interest in the said property."[3] In addition, one of the documents which wife signed at the title company was a quitclaim deed, releasing her interest in the property to husband. That deed states that the consideration given for its execution was less than $100; a handwritten notation indicates that no transfer tax is due because the transfer was a gift. Husband testified that he handwrote the gift language on the quitclaim deed; he did not have wife initial it.

Wife participated in management of the property, such as collecting rents. She was listed on a 1980 rental agreement and on a 1983-1984 business license certificate as an owner. In 1983 husband had the quitclaim deed recorded. In that year, a property tax bill came for the first time without wife's name on it; when she asked husband why her name was no longer on the bill, he replied that he did not know. Sometime later that year, the tenant showed wife a letter from an attorney stating that wife was no longer entitled to collect the rents; attached to the letter was a copy of the quitclaim deed. When wife asked husband for an explanation, he laughed at her.

At the date of separation in February 1986, the outstanding balance on four credit card accounts held in husband's name totaled approximately $10,840. After separation, husband made payments on those accounts of over $7,000. Wife testified that she used only a Mastercard account in both parties' names occasionally for living expenses during the marriage. She testified that husband used the other accounts for gambling.

---

[3] As stated, wife testified that husband brought the bank documents home for her to sign. However, the deed of trust itself bears the stamp of a notary and states that husband and wife personally appeared before her on May 23, 1977, and signed that document.

The trial court found that the San Bruno property was community and awarded half the net proceeds from the sale of that property to each party. It found each party responsible for one-half of the balance due in a credit card account in their joint names, but assigned husband all of the obligations on the credit cards in his name alone. Each party was ordered to pay his or her own attorney fees and costs.

Husband moved to vacate the judgment, arguing that he was entitled to reimbursement for his separate property contributions to the acquisition of the San Bruno property and that the credit card obligations should be divided equally. After a hearing, the motion was denied; this appeal followed.

### Characterization of the San Bruno Property as Community

 First, husband contends that there is no evidence to support the trial court's characterization of the San Bruno property as community. He acknowledges that when the San Bruno property was placed in his and wife's names as a married couple, a presumption arose that the property was community; he argues that the presumption was rebutted by the quitclaim deed and by the deed of trust in which wife disclaimed any interest in the property. Husband states that the trial court must have found him guilty of "overreaching" in obtaining wife's signature on those documents, but argues that the evidence does not support any such finding.

 "Property acquired during marriage by an instrument describing the marital partners as husband and wife is presumed to be community property 'unless a different intention is expressed in the instrument.' [Citations.]" (*In re Marriage of Fabian* (1986) 41 Cal.3d 440, 445-446 [224 Cal.Rptr. 333, 715 P.2d 253].) Prior to January 1, 1984, that presumption could be rebutted by evidence of an understanding or agreement to the contrary, either oral or written. (*In re Marriage of Buol* (1985) 39 Cal.3d 751, 757 [218 Cal.Rptr. 31, 705 P.2d 354]; *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 814-816 [166 Cal.Rptr. 853, 614 P.2d 285].) With the enactment of section 4800.1, effective January 1, 1984, the Legislature decreed that a writing is required to rebut the presumption with respect to joint tenancy property. (Stats. 1983, ch. 342, § 1, p. 1538.)

As we will discuss *infra,* controversy has arisen over the retroactive application of section 4800.1 and its companion, section 4800.2,[4] and the

---

[4] As will be discussed *infra,* the Legislature also enacted a companion section, 4800.2, which provides that upon dissolution a party is entitled to reimbursement of separate property contributions to community property absent a written waiver of the right to reimbursement. (Stats. 1983, ch. 342, § 2, p. 1538.)

Supreme Court has held that neither statute can be applied to cases which were pending on January 1, 1984. (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 451; *In re Marriage of Buol, supra,* 39 Cal.3d at pp. 755, 763.) Although that court has not yet considered whether the writing requirement of section 4800.1 can be applied to property acquired before January 1, 1984, in cases commenced after that date, we need not consider that question to determine whether the trial court in this case properly characterized the San Bruno property as community. ■ In this case there was a writing, the quitclaim deed, and the question is whether it was effective to rebut the community property presumption. The validity of a deed may be tested in a dissolution action if the parties have made the character of property held by them an issue in that proceeding. (See *Porter* v. *Superior Court* (1977) 73 Cal.App.3d 793, 804-805 [141 Cal.Rptr. 59].)

■ During marriage, there is a confidential relationship between husband and wife which imposes trust and confidence between them; in addition, spouses have a duty to deal with one another in good faith about the management and control of community property. (*In re Marriage of Stevenot* (1984) 154 Cal.App. 3d 1051, 1070 [202 Cal.Rptr. 116]; § 5103, subd. (b).) ■ "Where one signs an instrument without reading it in reliance on representations as to its contents in fact false, the instrument may be avoided where a confidential relation exists between the parties. [Citations.]" (*Kane* v. *Mendenhall* (1936) 5 Cal.2d 749, 758 [56 P.2d 498]; see also 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 407, p. 366 [rule applicable even where parties are not in confidential or fiduciary relationship].)

Whether one party has been induced to sign a document by the fraudulent misrepresentations of another party about the nature of the document is a question of fact. If supported by substantial evidence, the fact finder's resolution of this question will not be disturbed on appeal, even if the reviewing court considers that an inference other than that drawn by the fact finder is more reasonable. (*Forte* v. *Nolfi* (1972) 25 Cal. App.3d 656, 668-674 [102 Cal.Rptr. 455]; *McNulty* v. *Copp* (1949) 91 Cal.App.2d 484, 490 [205 P.2d 438].) When reviewing the sufficiency of the evidence, this court must view all factual matters most favorably to the prevailing party and in support of the judgment. (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) In this case, as neither party requested a statement of decision from the trial court, we must also presume that the trial court made whatever findings are necessary to sustain the judgment. (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 792-793 [218 Cal.Rptr. 39, 705 P.2d 362]; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 645 [183 Cal.Rptr. 508, 646 P.2d 179].)

■ Wife testified that initially she became very upset and refused to sign any document relating to financing the purchase of the San Bruno property because "it was taking me out of the whole property . . . ." Sometime later, husband told her he had made a mistake in removing her name; he said he had new papers for her to sign, to put her name on the property. He took her to the title company; she saw her name on the grant deed and signed it; she signed the other documents without reading them because she was in a hurry, and did not discover that she had signed a quitclaim deed until years later. That evidence supports the trial court's implied findings that husband intentionally misrepresented the nature of the transaction and that wife relied on those misrepresentations to her detriment. The implied finding of misrepresentation is also supported by husband's admission that he handwrote on the quitclaim deed that the transfer was a gift from wife and did not have wife initial that notation, and by his failure to record the quitclaim deed for over six years after its execution. Husband argues that wife's reliance on his misrepresentation was unreasonable given his prior conduct. In response, we find the following observation of the court in *Kane* v. *Mendenhall, supra,* 5 Cal.2d at pages 760-761, to be apt: "It is difficult in this case to discern from an inspection of the record where the truth lies. Weighing the credibility of the witnesses was the trial court's responsibility. The witnesses were in the presence of the trial [court], and [its] judgment as to their credibility is final in the matter."

### Right to Reimbursement

In the alternative, husband contends that if the San Bruno property was community, section 4800.2 entitles him to reimbursement of his traceable separate property contribution toward its acquisition.

Section 4800.2 altered the long-standing rule that separate property contributions to community assets were presumed gifts to the community absent a contrary agreement. The section mandates reimbursement of those contributions upon dissolution, unless the contributing spouse has waived the right to reimbursement in writing. As we have stated, the Supreme Court has held that application of section 4800.2 to cases pending on its effective date impairs vested rights without due process of law and is thus constitutionally impermissible. (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 451, fn. 12.)

Husband in *Fabian* had invested separate property in the purchase of a community property motel in 1972. Dissolution proceedings began in 1979; because there was no evidence of a reimbursement agreement, the trial court found that a gift to the community was intended. Judgment was

entered in 1982; while husband's appeal was pending, section 4800.2 was enacted. (*In re Marriage of Fabian, supra,* 41 Cal.3d at pp. 443-444.)

Analyzing whether section 4800.2 could constitutionally be applied to the proceedings, the Supreme Court first noted that from the time of purchase, wife had a vested community property interest in the motel which would be impaired by retroactivity. (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 446.) The court explained that impairment of a vested property interest alone does not invalidate retroactive application of a statute. "Retroactivity is barred only when such impairment violates due process of law . . . . [Citations.]" (*Id.,* at p. 448.) The court then considered several factors to determine whether application of the section to pending proceedings violated due process: (1) the significance of the state interest served by the law; (2) the importance of retroactive application to effectuate that interest; (3) the extent and legitimacy of reliance upon the former law; and (4) the disruption which would be caused by retroactivity. (*Ibid.*)

First, the court reviewed the legislative history of sections 4800.1 and 4800.2 and identified two legislative concerns underlying their enactment: the need for a community property presumption affecting joint tenancy property to aid courts in the division of marital property, and "an unexplained desire to abrogate the rule . . . that 'precluded recognition of the separate property contribution of one of the parties to the acquisition of community property.' [Citation.]" (*In re Marriage of Fabian, supra,* 41 Cal.3d at pp. 448-449.) That legislative interest, the court held, was not sufficiently significant to mandate retroactivity. The change cured no " 'rank injustice' " or "patent unfairness" in the law, as prior law had always permitted preservation of the separate property contribution by agreement with the other spouse. (*Id.,* at p. 449.) The court recognized the state's interest in the equitable dissolution of the marital partnership, but found "no discernible benefit" to that interest from making the statute applicable to pending proceedings. (*Ibid.*)

Next, although the court could not accurately ascertain wife's reliance on the former law, it found the legitimacy of such reliance to be clear; before section 4800.2, the no-reimbursement law had been followed for almost 20 years. (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 449.) As for the effect of retroactive application to pending cases, the court found it "difficult to imagine greater disruption than retroactive application of an about-face in the law, which directly alters substantial property rights, to parties who are completely incapable of complying with the dictates of the new law." (*Id.,* at p. 450.)

*Fabian* was decided in March 1986. Almost immediately thereafter, in April 1986, urgency legislation was enacted specifying that sections 4800.1

and 4800.2 applied "to proceedings commenced on or after January 1, 1984, *regardless of the date of acquisition of property* subject to the proceedings or the date of any agreement affecting the property." (Stats. 1986, ch. 49, § 1, p. 115, italics added.) In an uncodified section, the Legislature stated in part that sections 4800.1 and 4800.2 were initially enacted to "cure a serious problem in the law governing division of assets at dissolution of marriage"; it also stated that the urgency legislation was "intended to resolve the confusion caused by *Buol* [and presumably *Fabian*] and to reaffirm the need for immediately applicable legislation, to the extent constitutionally permissible, in order to assure all litigants of equitable treatment upon dissolution of marriage." (Stats. 1986, ch. 49, § 2, p. 115.)[5]

Despite this new explanation of legislative intent, in *In re Marriage of Griffis* (1986) 187 Cal.App.3d 156, 164-167 [231 Cal.Rptr. 510] (review den. Feb. 5, 1987), the appellate court held that section 4800.2 could not constitutionally be applied in a dissolution action filed after January 1, 1984, to property acquired before that date. Husband in *Griffis* deposited separate property funds in a joint account sometime before 1981; in that year those funds were used to purchase real property. A petition for dissolution was filed in May 1984. The trial court found that the funds in the joint account were community, but ordered husband reimbursed pursuant to section 4800.2. (*Griffis, supra,* 187 Cal.App.3d at p. 162.)

Relying heavily on *Fabian,* the *Griffis* court held application of the section would deprive wife of vested property rights without due process. The *Griffis* court presumed that when the Supreme Court decided *Buol* and *Fabian,* it had considered and rejected as inadequate every possible state interest underlying enactment of sections 4800.1 and 4800.2, *including* those explicitly stated in the 1986 amendment. The *Griffis* court recognized that the nonretroactive application of the two sections had caused some confusion and frustrated legislative intent, but held that those factors did not provide a sufficient basis for impairing vested property rights. (*In re Marriage of Griffis, supra,* 187 Cal.App.3d at p. 167.)[6]

---

[5] In *In re Marriage of Colombo* (1987) 197 Cal.App.3d 572, 581, footnote 1 [242 Cal.Rptr. 100], this court (Merrill, J.; White, P. J., and Scott, J., conc.) held that section 4800.2 as amended in 1986 was inapplicable to an action commenced before January 1, 1984.

[6] One factual difference between *Fabian* and *Griffis* was not discussed by the latter court, presumably because the *Griffis* court considered it of no legal significance. When the Legislature created the new right to separate property reimbursement effective January 1, 1984, the marriage of the parties in *Fabian* had already been terminated by a judgment of dissolution; under those circumstances, the Supreme Court considered it improbable that a writing waiving that right could then be obtained. (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 450.) In contrast, in *Griffis* the dissolution petition was filed about five months after section 4800.2 became effective. The *Griffis* court did not discuss whether wife might have obtained a writ-

Recently, in *In re Marriage of Hopkins & Axene* (1987) 199 Cal.App.3d 288 [245 Cal.Rptr. 433], another appellate court agreed with *Griffis* and held that where property was acquired before January 1, 1984, and judgment rendered prior to January 1, 1987, section 4800.2 could not be applied. (*Id.,* at pp. 292, fn. 2 and accompanying text, 293.)

Although *Griffis* was decided in November 1986, the court did not mention that in August 1986, the Legislature had again amended section 4800.1, effective January 1, 1987, to require written proof of separate property status with respect to all joint title acquisitions during marriage, not just those acquired in joint tenancy; this most recent amendment expressly states that it is inapplicable to judgments filed before January 1, 1987.[7] We must consider the constitutionality of applying this latest legislative enactment in the instant case, in which a judgment was entered in May 1987.

In addition to expanding the scope of the community property presumption, the August 1986 amendment also codified a lengthy statement of legislative intent, declaring the state's "compelling . . . interest" in providing for "uniform treatment of property" acquired during marriage in joint form.[8] Nevertheless, this most recent statement of legislative intent has not

---

ten waiver of reimbursement from husband during that brief period, but we interpret the court's silence on that issue as tacit recognition that there was no such possibility.

[7] The *Hopkins/Axene* court acknowledged the 1986 amendment in a footnote, but found it inapplicable because judgment in the case before the court was rendered in January 1986; the *Hopkins/Axene* court expressed no opinion as to the constitutional validity of the amendment. (*In re Marriage of Hopkins & Axene, supra,* 199 Cal.App.3d at p. 292, fn. 2.)

[8] "(a) The Legislature hereby finds and declares as follows: (1) It is the public policy of this state to provide uniformly and consistently for the standard of proof in establishing the character of property acquired by spouses during marriage in joint title form, and for the allocation of community and separate interests in that property between the spouses.

"(2) The methods provided by case and statutory law have not resulted in consistency in the treatment of spouses' interests in property which they hold in joint title, but rather, have created confusion as to which law applies at a particular point in time to property, depending on the form of title, and, as a result, spouses cannot have reliable expectations as to the characterization of their property and the allocation of the interests therein, and attorneys cannot reliably advise their clients regarding applicable law.

"(3) Therefore, the Legislature finds that a compelling state interest exists to provide for uniform treatment of property; thus the Legislature intends that the forms of this section and Section 4800.2, operative on January 1, 1987, shall apply to all property held in joint title regardless of the date of acquisition of the property or the date of any agreement affecting the character of the property, and that that form of this section and that form of Section 4800.2 are applicable in all proceedings commenced on or after January 1, 1984. However, the form of this section and the form of Section 4800.2 operative on January 1, 1987, are not applicable to property settlement agreements executed prior to January 1, 1987, or proceedings in which judgments were rendered prior to January 1, 1987, regardless of whether those judgments have become final. . . ." (Stats. 1986, ch. 539, § 1, pp. 1924-1925.)

altered the nature of the interest which the Supreme Court and the Courts of Appeal have consistently found inadequate to justify retroactive application to property acquired before the effective date of the statute. Labeling the interest as "compelling" does not make it so. As the *Fabian* court pointed out, prior law was not inherently inequitable or unfair; the spouse contributing separate property could readily preserve the separate property character of the contribution by agreement, either written or oral, with the other spouse. (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 449.) In the words of the *Fabian* court, "We find no discernible benefit to the state's interest in the equitable dissolution of the marital partnership . . ." in applying the statute to property acquired before its effective date. (See *ibid.*)

The facts of this case dramatically illustrate the inequitable and disruptive effect of retroactive application of the section to property acquired before its enactment. When husband contributed his separate property to the couple's joint account in 1975, a gift to the community was presumed because there was no agreement to the contrary. Nor was there any evidence of a reimbursement agreement when the couple took title to the San Bruno property in 1977. By the time section 4800.2 was first enacted in 1983, husband had fraudulently induced his wife to execute a deed quitclaiming her interest in the real property in dispute. Even though no petition for dissolution had been filed at this point, husband "could hardly be expected to then execute a writing waiving his right to the property he claimed." (*In re Marriage of Fabian, supra,* 41 Cal.3d at p. 450.)

Our conclusion is consistent with that of the Fourth Appellate District in *In re Marriage of Bankovich* (1988) 203 Cal.App.3d 49 [249 Cal.Rptr. 713]. The *Bankovich* petition for dissolution was filed after January 1, 1984; judgment was entered in February 1987; thus section 4800.2 was facially applicable. Nevertheless, the appellate court reversed that portion of the judgment ordering wife to reimburse husband for his separate property contribution to a home purchased during the marriage in 1980. Reasoning that the constitutional defects in section 4800.2 could not be erased by "mere legislative pronouncement," the court held that application of the section to property acquired before its enactment would unconstitutionally deprive persons of vested property rights without due process. (*Bankovich, supra,* at pp. 51, 55.)

In summary, we conclude that application of section 4800.2 to this case would impair wife's vested property interests without due process. The trial court did not err in refusing to order reimbursement.

*Credit Card Obligations*

 Husband also contends the trial court erred when it did not divide the credit card obligations equally. Husband's argument is based on the assumption that the court determined those debts to be community liabilities.

The general rule is that debts incurred by either spouse after the date of marriage but prior to separation are to be divided equally, unless community debts exceed community assets. (§ 4800, subds. (a), (c)(2).) However, section 4800, subdivision (d), provides that "all separate debts, including those debts incurred by a spouse during marriage and before the date of separation that were not incurred for the benefit of the community, shall be confirmed without offset to the spouse who incurred the debt." (§ 4800, subd. (d).) "In other words, once the court characterizes a liability as a 'separate debt,' that debt does not factor into the equal community property division." (Hogoboom & King, Cal. Practice Guide, Family Law (1988) § 8:279.7, p. 8-224.)

Listing the couple's "community property," the court included the balance due on a joint credit card account of approximately $1,100 but did not mention the balance due on the credit card accounts in husband's name alone. In its "division of community property and obligations," the court assigned to each spouse one-half of that $1,100 obligation; in addition, it assigned to husband the obligations on the credit cards in his name alone. As we understand the court's findings and judgment, it found those credit card obligations to be husband's separate debts because they were not incurred for the benefit of the community, and properly confirmed them without offset to husband.

The evidence supports that determination. Wife testified that when she discovered the credit cards in husband's name alone and saw that the amounts owed on those accounts kept increasing, she questioned husband about the debt. She testified that he replied, "I need money for gambling. I need money." She also testified that he gave her no money for the house from the money he borrowed from those accounts. Husband himself testified that he sometimes gambled, although he stated that he used the credit card loans to pay for the "family . . . living." The resolution of the conflict in the evidence was for the trial court; we will not disturb that determination.

*Disposition*

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.