Filed 5/9/18

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of G.C. and R.W. | D073119 |
| G.C., | |
| Respondent, | (Super. Ct. No. IND1201870) |
| v. | |
| R.W., | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Mickie E. Reed, Temporary Judge. (Pursuant to Cal. Const., art VI, § 21.) Affirmed in part; reversed in part; remanded with directions.

La Quinta Law Group and Timothy L. Ewanyshyn for Appellant.

Lewis Brisbois Bisgaard & Smith and Lann G. McIntyre for Respondent.

_____

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.C–F.

# I.

## INTRODUCTION

R.W. appeals from a judgment of dissolution of his marriage with his former husband, respondent, G.C.[1]  R.W. raises numerous claims on appeal, two of which we address in published portions of this opinion.  First, R.W. claims that the trial court erred in determining that the parties' date of union was in 2009 when the parties married, rather than in 2004, when they entered into a domestic partnership under New Jersey law.  R.W. contends that the parties' New Jersey domestic partnership is "substantially equivalent" (Fam. Code, § 299.2)[2] to a California domestic partnership such that it could be dissolved pursuant to section 299, and thus, that the court should have considered the date of the parties' domestic partnership to be the date of union for purposes of the dissolution.  After interpreting the meaning of "substantially equivalent" in section 299.2 as a matter of first impression, we conclude that in light of the limited nature of the rights and obligations that the parties obtained in entering into a domestic partnership under New Jersey law, the trial court properly determined that the parties' 2004 New Jersey domestic partnership was not "substantially equivalent" to a California domestic partnership under section 299.2 so as to permit its dissolution under California law.  We therefore conclude that the trial court properly determined that the parties' date of union was in 2009.

---

[1]     We refer to the parties by their initials, in order to attempt to provide them with some degree of privacy with respect to personal medical information that is discussed in this opinion.

[2]     Unless otherwise specified, all subsequent statutory references are to the Family Code.

R.W. also claims that the trial court erred in failing to divide equally the appreciation of the value of certain real property that the parties acquired as joint tenants during their marriage, as a community asset. Specifically, R.W. contends that the trial court erred in applying a formula for apportioning separate and community property interests in the value of the appreciation because the joint title community property presumption contained in section 2581 applied to the property, and the appreciation therefore belonged entirely to the community. We agree with R.W. and conclude that the trial court erred in failing to divide the appreciation in value of the marital residence equally.

We reject the remainder of R.W.'s claims in unpublished portions of the opinion. Accordingly, we reverse the judgment and remand the matter to the trial court with directions to divide the appreciation in value of the marital residence equally as a community asset. In all other respects, we affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

R.W. and G.C. purchased a home together in New Jersey in 2002. In 2004, the couple entered into a New Jersey domestic partnership. They moved from New Jersey to New York in 2006 and married in Connecticut in 2009.

R.W. and G.C. purchased a home in California (the "marital residence") in 2011 and moved to California that same year. G.C. filed a form petition for dissolution of marriage the following year.

3

After conducting a court trial on the petition, the trial court issued a statement of decision and entered a judgment incorporating that statement. Among other issues, the court determined that the parties' date of marriage was February 6, 2009, the date G.C. and R.W. married in Connecticut. The court also concluded that the parties had separate property interests in the appreciation in the value of the marital residence, in amounts proportional to their separate property contributions to the down payment.[3] The court declined to award R.W. any permanent spousal support or to order that G.C. pay any of R.W.'s attorney fees.[4]

R.W. appealed from the judgment. While R.W.'s appeal was pending, the trial court issued an amended judgment that incorporated a revised statement of decision. R.W. subsequently filed a second notice of appeal from the amended judgment.

III.

DISCUSSION

A. *The trial court properly determined the parties' date of marriage to be in 2009 because their 2004 New Jersey domestic partnership was not "substantially equivalent" to a California domestic partnership under section 299.2 so as to permit its dissolution under section 299*

R.W. claims that the trial court erred in determining that the parties' date of marriage was February 6, 2009, the date that he and G.C. married in Connecticut. He

---

[3]    The court found that G.C. had a separate property interest in the appreciation in the amount of $32,745 and that R.W. had a separate property interest in the appreciation in the amount of $6,705.88.

[4]    The court noted that G.C. had paid R.W. temporary spousal support during the pendency of the litigation, and that G.C. had paid $10,000 for R.W.'s attorney fees pursuant to a prior court order.

4

argues that the court should have instead concluded that the operative date of union was August 10, 2004, the date on which he and G.C. entered into a domestic partnership under New Jersey law.

R.W. contends that the parties' New Jersey domestic partnership is "substantially equivalent" (§ 299.2) to a California domestic partnership, and that the trial court therefore erred in concluding that the 2004 New Jersey domestic partnership was not a valid domestic partnership that could be dissolved under California law. R.W.'s claim turns on the proper interpretation of section 299.2, an issue that we review de novo. (See *In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 201 [statutory interpretation claims are reviewed de novo].)

1. *Governing law*

a. *The relevant statutes*

Section 297 permits two persons "of the same sex,"[5] to enter a domestic partnership by filing a declaration with the Secretary of State establishing their partnership.[6]

---

[5] Although not relevant here, section 297 also authorizes two persons "over 62 years of age," who are of "opposite sexes," to enter a domestic partnership under certain circumstances. (§ 297, subd. (b)(4)(B).)

[6] Section 297 provides in relevant part:

> "(a) Domestic partners are two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring.
> "(b) A domestic partnership shall be established in California when both persons file a Declaration of Domestic Partnership with the Secretary of State pursuant to this division, and, at the time of filing, all of the following requirements are met:

Section 297.5, subdivision (a) provides that domestic partners shall have the same rights and obligations as spouses:

> "(a) Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses."

Section 299, subdivision (d) governs the dissolution of a domestic partnership and provides in relevant part:

> "(d) The superior courts shall have jurisdiction over all proceedings relating to the dissolution of domestic partnerships . . . . The dissolution of a domestic partnership . . . shall follow the same procedures, and the partners shall possess the same rights, protections, and benefits, and be subject to the same responsibilities, obligations, and duties, as apply to the dissolution of marriage . . . ."

Section 299.2 describes the extent to which California law recognizes nonmarital same-sex unions formed in other jurisdictions:

> "A legal union of two persons of the same sex, other than a marriage, that was validly formed in another jurisdiction, and that is substantially equivalent to a domestic partnership as defined in this

---

> "(1) Neither person is married to someone else or is a member of another domestic partnership with someone else that has not been terminated, dissolved, or adjudged a nullity.
> "(2) The two persons are not related by blood in a way that would prevent them from being married to each other in this state.
> "(3) Both persons are at least 18 years of age . . . .
> "(4) Either of the following:
>    "(A) Both persons are members of the same sex.
>    "[¶] . . . [¶]
> "(5) Both persons are capable of consenting to the domestic partnership."

6

part, shall be recognized as a valid domestic partnership in this state regardless of whether it bears the name domestic partnership."

Sections 297, 297.5, 299, and 299.2 were enacted in 2003 as part of The California Domestic Partner Rights and Responsibilities Act (the Act). (Stats. 2003, ch. 421.)[7] The Act, which was adopted in 2003, and took effect January 1, 2005, "extend[ed] the rights and duties of marriage to persons registered as domestic partners on and after January 1, 2005." (Legis. Counsel's Dig., Assem. Bill No. 205 (2003–2004 reg. sess.) Stats. 2003, ch. 421.)

The Act also enacted section 299.3. Section 299.3 required the Secretary of State to mail a notice to previously registered domestic partners to inform them that California law related to the rights and responsibilities with respect to registered domestic partners was changing in material ways as a result of the adoption of the Act. The letter informed registered partners that they would be subject to the changed law unless they terminated their domestic partnership prior to January 1, 2005.[8]

---

[7] Section 297 was initially adopted in 1999 (Stats. 1999, ch. 588, § 2), and was amended as part of the Act. (Stats. 2003, ch. 421, § 3.) The Act repealed a prior version of section 299, and added current section 299, as well as section 297.5, section 299.2, and section 299.3 (discussed below). (Stats. 2003, ch. 421, §§ 4, 8–10.)

[8] The notice referred to in section 299.3 provides in relevant part:

" 'Dear Registered Domestic Partner:

" 'This letter is being sent to all persons who have registered with the Secretary of State as a domestic partner.

" 'Effective January 1, 2005, California's law related to the rights and responsibilities of registered domestic partners will change (or, if you are receiving this letter after that date, the law has changed, as of January 1, 2005). With this new legislation, for purposes of

b. *Principles of statutory interpretation*

In *Acqua Vista Homeowners Assn. v. MWI, Inc.* (2017) 7 Cal.App.5th 1129, 1140

(*Acqua Vista*), this court restated the following well-established rules of statutory

interpretation:

> " ' " 'In construing any statute, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." [Citation.] "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context." [Citation.] If the statutory language is unambiguous, "we presume the Legislature

---

> California law, domestic partners will have a great many new rights and responsibilities, including laws governing community property, those governing property transfer, those regarding duties of mutual financial support and mutual responsibilities for certain debts to third parties, and many others. The way domestic partnerships are terminated is also changing. After January 1, 2005, under certain circumstances, it will be necessary to participate in a dissolution proceeding in court to end a domestic partnership.

> " 'Domestic partners who do not wish to be subject to these new rights and responsibilities MUST terminate their domestic partnership before January 1, 2005. Under the law in effect until January 1, 2005, your domestic partnership is automatically terminated if you or your partner marry or die while you are registered as domestic partners. It is also terminated if you send to your partner or your partner sends to you, by certified mail, a notice terminating the domestic partnership, or if you and your partner no longer share a common residence. In all cases, you are required to file a Notice of Termination of Domestic Partnership.

> " 'If you do not terminate your domestic partnership before January 1, 2005, as provided above, you will be subject to these new rights and responsibilities and, under certain circumstances, you will only be able to terminate your domestic partnership, other than as a result of your domestic partner's death, by the filing of a court action.' "

8

meant what it said, and the plain meaning of the statute governs."
[Citation.]' [Citation.]

" ' " 'If, however, the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we will "examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes," and we can " ' "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " [Citation.]' [Citation.]

" ' " ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " ' "

2. *Factual and procedural background*

a. *The parties' pretrial pleadings*

G.C. filed a form petition for dissolution of marriage. In his petition, G.C. indicated that the parties had entered into a domestic partnership in 2004 and a marriage in 2009. G.C. checked a box next to the statement, "Our domestic partnership or marriage to a person of the same sex was established in a place other than California and a dissolution is requested." G.C. also checked a box on the form indicating that he was requesting dissolution of the marriage.[9]

In August 2013, R.W. filed a form response in which he indicated that he sought dissolution of a 2004 domestic partnership and a 2009 marriage.

_____

9    The form contains the words, "Petitioner requests," (boldface omitted) a checked box next to the words, "dissolution of the," an unchecked box next to the words, "domestic partnership," and a checked box next to the word, "marriage."

In July 2015, R.W. filed a request for order seeking to be granted permission to file an amended response to indicate that the operative date of dissolution was in 2004, rather than in 2009, as stated in the original response, and to provide a list of alleged separate and community property. In his request, R.W. stated that he and G.C. had entered into a registered domestic partnership in New Jersey in 2004. Citing section 299.2, R.W. contended that California recognized the legitimacy of domestic partnerships entered into in other states. R.W. attached a copy of an August 2004 New Jersey certificate of domestic partnership to his request.

G.C. filed an opposition to the request, and attached a supporting declaration. In his declaration, G.C. stated in relevant part:

> "[R.W.] and I signed an affidavit of New Jersey Domestic Partnership with the City of Long Hill, NJ town clerk on August 10, 2004. Our primary reason for filing was to preserve our rights to act upon each other's behalf during medical emergencies. Our respective rights to employer-provided benefits were another strong consideration. At the town clerk's office, we were given a copy of the New Jersey Department of Health, Office of Vital Statistics and Registry publication titled *NOTICE OF RIGHTS AND OBLIGATIONS OF DOMESTIC PARTNERS*, attached hereto as **Exhibit A** . . . .

> " . . . At no time did I or [R.W.] consider this to be a marriage as that option was available to us in August 2004 in the state of Massachusetts (since May 2004). When we ultimately did decide to get married in 2009 (five years after we elected domestic partnership), we went to Connecticut to be married."

G.C. also stated in his declaration that R.W. failed to provide the court with any evidence of New Jersey domestic partnership law that would permit the court to make the

10

determination whether a New Jersey domestic partnership is "substantially equivalent" (§ 299.2) to a California domestic partnership. G.C. further stated:

> "The New Jersey law of domestic partnerships did not offer a right of entitlement to support, or property sharing, when the relationship dissolved. There was no equivalent of alimony, or division of marital assets, for domestic partners. New Jersey law did <u>not</u> include a domestic partner in the intestate succession scheme. A domestic partner was not entitled to an elective share of the other partner's estate. The New Jersey law did not specifically amend the state's tort laws to give domestic partners standing to sue for the injury or death to the other."

G.C. attached as an exhibit to his declaration a document entitled "Notice of Rights and Obligations of Domestic Partners" (the Notice of Rights) (formatting omitted), issued by the New Jersey Department of Health. Under the heading, "Terminating a Domestic Partnership," (boldface omitted) the Notice of Rights stated that the Superior Court of New Jersey would have jurisdiction over all proceedings to terminate a domestic partnership and that "[i]n all such proceedings, the court shall in no event be required to effect an equitable distribution of property, either real or personal, which was legally and beneficially acquired by both domestic partners or either domestic partner during the domestic partnership." G.C. also attached the relevant New Jersey statutes governing domestic partnerships.

The trial court granted R.W.'s request to file an amended response. In his amended response, R.W. sought dissolution of the 2004 domestic partnership. R.W. left unchecked a box next to the statement, "We are married."

R.W. filed a trial brief in which he indicated that "[t]he date of marriage is disputed." R.W. quoted section 299.2 and contended that "the New Jersey Domestic

11

Partnership created on August 10, 2004, is the operative date of marriage." R.W. did not present any argument or evidence in support of the contention that a New Jersey domestic partnership should be deemed "substantially equivalent" to a California domestic partnership under section 299.2.

R.W. subsequently filed a request for a statement of decision in which he requested that the court determine the "[d]ate of marriage for purposes of dissolution."

b. *The trial*

During the trial, G.C. testified that the parties entered into a domestic partnership in New Jersey in August 2004. G.C. stated that he was aware of the legal rights and obligations that entering the domestic partnership created for the parties. G.C. explained his belief that entering the domestic partnership did not provide either party with an interest in the other party's assets or obligations. G.C. stated that he and R.W. moved from New Jersey to New York in 2006, married in Connecticut in 2009, and moved to California in 2011.

R.W. testified that he and G.C. purchased a house together in 2002, and that they would have married at that time if gay marriage had been legally recognized. R.W. agreed that he and G.C. entered into a domestic partnership in New Jersey in 2004 and that they got married in Connecticut in 2009.

The court admitted in evidence the parties' 2004 New Jersey Domestic Partnership certificate, a copy of the New Jersey Notice of Rights, and the parties' 2009 Connecticut marriage license.

c. *The trial court's ruling*

After the trial, the court issued a proposed statement of decision. The court stated that the parties disputed the proper date of marriage for purposes of the dissolution, with R.W. contending that the date of marriage should be deemed to be in 2004, when the parties entered into a domestic partnership in New Jersey, and G.C. contending that the date of marriage was in 2009, when the parties married in Connecticut. The court further noted that G.C. maintained that "the domestic partnership laws in New Jersey are not 'substantially equivalent' to the domestic partnership laws in California, and therefore the New Jersey domestic partnership should not be recognized in California."

The court observed that R.W. had not offered any " 'substantial equivalency,' " arguments, and that "a facial comparison of the domestic partnership laws of New Jersey and California shows that each offers widely differing rights and protections." The court reviewed New Jersey and California law governing domestic partnerships, and noted that while New Jersey law provided "a few select rights" to domestic partners, California law "extends all of the rights and duties of marriage to domestic partners." Accordingly, the court determined that a New Jersey domestic partnership cannot be said to be " 'substantially equivalent,' " to a California domestic partnership. The court thus concluded that California law did not recognize the 2004 New Jersey domestic partnership under section 299.2. The court further concluded that the proper date of marriage was February 6, 2009, the date on which the parties married in Connecticut.

R.W. filed a series of objections to the proposed statement of decision. None of the objections pertained to the date of marriage issue. The trial court subsequently

13

entered an amended judgment[10] that incorporated a statement of decision identical to the proposed statement of decision with respect to the date of marriage.

### 3. *Application*

#### a. *We reject the parties' procedural arguments*

Before considering the merits of R.W.'s claim, we reject two procedural arguments that the parties raise. First, we reject G.C.'s argument that R.W. forfeited his contention because R.W. did not raise an objection to the trial court's proposed statement of decision with respect to this issue. R.W. clearly raised the issue of the proper date of union for purposes of the dissolution in the trial court, and the issue was fully litigated. G.C. cites no authority, and we are aware of none, that would require a party to reassert an objection to the *merits* of a trial court's decision by way of an objection to a proposed statement of decision in order to preserve the objection for purposes of an appeal. (Cf. *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 292 ["The main purpose of an objection to a proposed statement of decision is *not* to reargue the merits, but to bring to the court's attention inconsistencies between the court's ruling and the document that is supposed to embody and explain that ruling" (italics added)].) Accordingly, we conclude that R.W. did not forfeit his contention that the trial court erred in determining the date of marriage to be in 2009 by failing to raise this issue in his objections to the trial court's proposed statement of decision.

---

10     The amendment pertained to the issue discussed in part III.E, *post*. The original judgment was identical to the amended judgment with respect to the date of marriage issue.

We also reject R.W.'s suggestion that he was not on notice that the date of marriage issue would be decided at trial. R.W. supports this contention by asserting that G.C.'s petition and R.W.'s amended response both "alleged the date of marriage to be 2004." R.W. argues that "[therefore] the date of marriage really was not formally at issue in the operative pleading." R.W.'s argument fails for two reasons. First, G.C.'s petition stated that the date of marriage was "02/03/09," not "2004." Second, the pleadings described in part III.A.2, *ante*, make it abundantly clear that R.W. had notice that the date of marriage would be, as R.W. stated in his request for a statement of decision, one of the "controverted issues" at trial.

> b. *The trial court properly concluded that the parties' 2004 New Jersey domestic partnership is not substantially equivalent to a California domestic partnership and thus, did not provide the applicable date of union for their dissolution*[11]

R.W. contends that the trial court erred in determining that the 2004 New Jersey domestic partnership did not provide the date of union for purposes of this dissolution proceeding.

As quoted above, section 299.2 provides, "A legal union of two persons of the same sex, other than a marriage, that was validly formed in another jurisdiction, and that is substantially equivalent to a domestic partnership as defined in this part, shall be

---

[11] Although R.W. contends that the trial court erred in failing to determine the date of *marriage* to be in 2004, it is undisputed that the parties were not *married* until 2009. Thus, we interpret his argument to be that the trial court erred in failing to utilize the 2004 New Jersey domestic partnership as the date of union for purposes of the dissolution.

15

recognized as a valid domestic partnership in this state regardless of whether it bears the name domestic partnership."

The text of the statute suggests that to be "recognized as a valid domestic partnership in this state"—and thus subject to dissolution under section 299—a nonmarital same sex legal union must be "substantially equivalent to a domestic partnership as defined in this part."[12]  The Act does not elaborate with respect to the meaning of the phrase "substantially equivalent," and we are not aware of any case law addressing this issue.  However, the statutory text suggests that the Legislature intended to recognize unions formed under the laws of another jurisdiction that are *substantively comparable* to domestic partnerships as defined under the Act, even if the union is referred to by another *name* under the other jurisdiction's law.  Commentators agree with this interpretation.  (California Domestic Partnerships and Same-Sex Marriage (Cont.Ed.Bar 1st ed. 2017) § 1.17 [in discussing section 299.2, stating, "Although the various jurisdictions may call the same-sex relationship by different names, the substance of the rights, benefits, and privileges, not the name of the institution, controls"]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2007) [¶]

---

12      We interpret "a domestic partnership as defined in this part," as referring to a domestic partnership as defined in section 297 (i.e., a California domestic partnership). Section 299.2 is codified in Part 4 of Division 2.5 of the Family Code, and section 297 is codified in Part 1 of Division 2.5 of the Family Code.  While section 299.2 refers to "a domestic partnership as defined *in this part*" (italics added), there is no "domestic partnership" defined in Part 4 of the Family Code.  However, since section 299.2 and section 297 were both adopted as part of the Act, and section 297 contains the definition of a domestic partnership, it is clear that "a domestic partnership as defined in this part," (§ 299.2) refers to a domestic partnership as defined in section 297.

16

20:233 (Hogoboom) ["Arguably, the out-of-state legal union is *not* of 'substantial equivalence' within the meaning of the [Act] if the law under which it was formed does not extend to the partners substantially the same *substantive rights and responsibilities* (property rights, debt liability, partner support, etc.) afforded domestic partners under the [Act]"]; William C. Duncan, *Survey of Interstate Recognition of Quasi-Marital Statuses* (2005) 3 Ave Maria L.Rev. 617, 626 [quoting section 299.2 and stating, "California's approach is to treat *quasi-marital* statuses as domestic partnerships" (italics added)].)

Our interpretation is supported by a consideration of the "ostensible objects to be achieved," by the adoption of section 299.2. (*Acqua Vista*, *supra*, 7 Cal.App.5th at p. 1140.) At the time the Act was adopted, the laws of many states were changing with respect to the types of legal statuses into which same-sex couples could enter, with a corresponding variety of names for the statuses being recognized. (See generally, Stein, *The Topography of Legal Recognition of Same-Sex Relationships* (2012) 50 Fam. Ct. Rev. 181 (Stein).)[13] Section 299.2 ensures that a union is subject to dissolution under California law so long as the union had the same quasi-marital status under the foreign

_____

[13]     Stein specifically notes the wide variety of relationships referred to by states as "domestic partnerships":

> "In light of the wide variation in nonmarital relationships labeled 'domestic partnerships'—from those that provide just a handful of benefits to those that give the full panoply of benefits associated with marriage—henceforth, I refer to domestic partnerships like the kind available in Maryland, which give a small subset of the rights associated with marriage, as *limited domestic partnerships*. In contrast, I refer to domestic partnerships like the kind available in California, which are virtually identical to civil unions, as *broad domestic partnerships*." (Stein, *supra*, at pp. 188–189.)

17

jurisdiction's law as a California domestic partnership has under the Act, no matter the nomenclature used by the other jurisdiction in describing that union.

This interpretation is bolstered by an examination of other provisions of the Act. (See *Acqua Vista*, *supra*, 7 Cal.App.5th at p. 1140 [in interpreting a statute a court is to consider " ' " ' "context in which the language appears" ' " ' "].)  As the Court of Appeal in *Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1165 (*Velez*) observed, "The declarations that accompanied the enactment of [the Act] left no doubt of the legislative intent to greatly expand the rights and responsibilities of properly registered domestic partners." (See *id.* at pp. 1163–1165 [outlining the history of domestic partnerships under California law]; see § 297.5 [stating that registered domestic partners shall have the same rights and obligations as spouses].)  In enacting the Act, the Legislature also made clear its intent that those individuals who had previously registered in California as domestic partners would be provided with notice of the impending change to the legal nature of their partnership, and given an opportunity to terminate the partnership prior to the change in the law.  (§ 299.3.)

Interpreting section 299.2 as evincing the Legislature's intent to recognize a union formed in another jurisdiction for purposes of dissolution under section 299 so long as the union is *substantively comparable* to a domestic partnership formed under the Act is consistent with the Legislature's intent both to recognize such unions as equivalent to marriage for purposes of dissolution and to ensure that individuals in such relationships have notice that their union will be treated as having quasi-marital status for purposes of California dissolution law.  In contrast, to recognize a relationship *not* having quasi-

18

marital status under the jurisdiction in which the relationship was formed as nevertheless *having* such status under California law would be incongruous with the Legislature's intent in enacting section 299.3 to ensure that individuals were aware of the "binding effect of the impending momentous changes in the legal consequences of a legally recognized domestic relationship." (*Velez*, *supra*, 142 Cal.App.4th at p. 1168.)[14]

R.W.'s arguments to the contrary are not persuasive. R.W. asserts that section 299.2 should be interpreted as providing that "a domestic partnership in another state is 'substantially equivalent' to a domestic partnership in California if it is a union of *two* persons of the same sex," and contends that a "polygamous union" in another jurisdiction would thus not be recognized as " 'substantially equivalent,' " under section 299.2. Section 299.2 expressly states that only a "legal union of *two* persons of the same sex," that is "substantially equivalent" to a California domestic partnership shall be recognized under section 299.2. (Italics added.) Thus, polygamous unions are not recognized under section 299.2 by virtue of the statute's reference to a "legal union of *two* persons." (Italics added.) R.W.'s interpretation of section 299.2 is unpersuasive since it gives no effect to the words "substantially equivalent" (§ 299.2) in the statute. (See, e.g., *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630 [" ' "Whenever possible, significance must be given to every word [in a statute] in pursuing the legislative purpose, and the court should avoid a construction that makes some words surplusage" ' "].)

---

14    Neither party cited, and our own research has not uncovered, any relevant legislative history bearing on the issue presented on appeal.

R.W. also notes that, pursuant to section 297, subdivision (a) domestic *partners* are defined as " 'two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring,' " and contends that, "[s]o long as the domestic partnership law of New Jersey defines domestic *partners* similarly, a New Jersey domestic partnership must be 'substantially equivalent,' to a California domestic partnership." (Italics added.) Section 299.2 provides for the recognition of an out-of-state "legal *union*," that is "substantially equivalent to a [California] domestic *partnership*." (Italics added.) Thus, recognition under the statute turns on whether domestic *partnerships* are substantially equivalent under New Jersey and California law, not whether domestic *partners* are defined similarly in the two jurisdictions. With respect to the former issue, which we view as the decisive factor in determining whether the out-of-state union may be dissolved under California law, R.W. presented *no* argument in either the trial court or this court that the parties' 2004 New Jersey domestic partnership is substantively comparable to a domestic partnership formed under the Act.

For example, R.W. does not contend that New Jersey law afforded domestic partners comparable rights with respect to property division, debt liability, or partner support as California law provides domestic partners. Even a cursory examination of the two statutory schemes makes clear that the legal rights conferred by the domestic partnership laws differ dramatically in the two states. (Compare § 297.5, subd. (a) ["Registered domestic partners shall have the *same* rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law . . . as are granted to and imposed upon spouses"] with N.J.S.A. § 26:8A-2 ["[a]ll persons in

20

domestic partnerships should be entitled to *certain* rights and benefits that are accorded to married couples under the laws of New Jersey, including: statutory protection . . . against various forms of discrimination based on domestic partnership status . . . ; visitation rights for a hospitalized domestic partner and the right to make medical or legal decisions for an incapacitated partner; and an additional exemption from the personal income tax and the transfer inheritance tax on the same basis as a spouse"].) New Jersey law expressly provides, "The obligations that two people have to each other as a result of creating a domestic partnership shall be limited to the provisions of this act." (N.J.S.A. § 26:8A-6.a.) Significantly, New Jersey law provides that, in proceedings to terminate a domestic partnership, "The court shall in no event be required to effect an equitable distribution of property, either real or personal, which was legally and beneficially acquired by both domestic partners or either domestic partner during the domestic partnership." (N.J.S.A. § 26:8A-10.a.3.)[15]

R.W. contends that to interpret section 299.2 as recognizing only those unions that "grant . . . same-sex couples the full range of rights afforded to married spouses," "discriminates against same-sex couples by treating them differently from traditional

---

[15] In 2006, the New Jersey Legislature passed the Civil Union Act (L. 2006, ch. 103, § 92). Pursuant to this statute, which became effective February 19, 2007, same-sex couples were authorized to enter into civil unions with all of the rights and obligations afforded to married couples under state law. (N.J.S.A. § 37:1-33.) The Civil Union Act expressly states that the law "shall not alter the rights and responsibilities of domestic partnerships existing before the effective date of this act, except that eligible domestic partners shall be given notice and opportunity to enter into a civil union pursuant to the provisions of this act." (N.J.S.A. § 26:8A-4.1.) It is undisputed that R.W. and G.C., who moved to New York in 2006, did not enter into a civil union under New Jersey's Civil Union Act.

married couples."  In support of this contention, R.W. raises an argument that is difficult to follow, but that culminates with the assertion that, "Clearly, California recognizes the validity of marriages celebrated in other jurisdictions that do not have community property laws.  It should not be any different for domestic partnerships."  This argument suggests that the basis for concluding that the parties' New Jersey domestic partnership was not substantially equivalent to a California domestic partnership for purpose of dissolution under section 299 is that California is a community property state, while New Jersey is not.  However, our conclusion that the 2004 New Jersey domestic partnership is not "substantially equivalent" (§ 299.2) to a California domestic partnership for purposes of dissolution is grounded on the fact that the New Jersey domestic partnership does not confer substantively similar legal rights and benefits to a domestic partnership formed under the Act, not the fact that the two states differ with respect to their recognition of community property principles.[16]

Accordingly, we conclude that the trial court properly determined the parties' date of marriage to be in 2009, because their 2004 New Jersey domestic partnership is not "substantially equivalent" to a California domestic partnership under section 299.2.[17]

---

[16]    While R.W. asserts that it "is a matter of equal protection under the law," that the New Jersey domestic partnership be recognized as "substantially equivalent" to a California domestic partnership, he fails to adequately raise this claim with supporting authority and argument.  The contention is thus forfeited. (See, e.g., *Trinkle v. California State Lottery* (2003) 105 Cal.App.4th 1401, 1413 ["unless a party's brief contains a legal argument with citation of authorities on the point made, the court may treat it as waived and pass on it without consideration"].)

[17]    While the trial court stated that California does not "recognize[ ]" the New Jersey domestic partnership, we do not make such a broad pronouncement here.  More

22

B. *The trial court erred in failing to divide the appreciation in value of the marital residence equally*

R.W. claims that the trial court erred in failing to divide the appreciation in the value of the marital residence equally. Specifically, R.W. contends that the trial court erred in applying a formula for apportioning separate and community property interests in the appreciation in value of property discussed in *In re Marriage of Lucas* (1980) 27 Cal.3d 808 (*Lucas*). R.W. argues that the *Lucas* formula may be applied only in cases in which a spouse maintains a separate property interest in the property. R.W. maintains that the *Lucas* formula may not be used in this case because the trial court did not find that the joint title presumption of community property contained in section 2581 had been rebutted, and there is no such evidence upon which the court could have made such a finding.

---

specifically, we need not decide in this appeal whether there might be *some instances* in which a California court *would* recognize a New Jersey domestic partnership (as distinguished from a civil union). For example, we have no occasion to determine whether, under section 299.2, a person could enforce "visitation rights for a hospitalized domestic partner" (N.J.S.A. § 26:8A-2) in a California court under the theory that the person's New Jersey domestic partnership is "substantially equivalent" to a "domestic partnership as defined in this part," for this purpose. (§ 299.2.) We also need not consider any potential applicability of the full faith and credit clause of the United States Constitution, because R.W. presents no argument with respect to this provision. (U.S. Const., art IV, § 1 ["Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State"].) Rather, we need determine only whether the trial court was correct that section 299.2 should not be interpreted to provide that the parties' 2004 New Jersey domestic partnership *may not be dissolved under section 299*. For the reasons discussed in the text above, we conclude that the trial court properly determined this issue.

23

G.C. contends that the trial court determined that the "joint title presumption of community property [had been] rebutted," and that the court correctly calculated the value of his separate property interest pursuant to *Lucas*.

1. *Factual and procedural background*

The relevant facts are undisputed. The trial court found that the parties acquired the marital residence as joint tenants during marriage. The court further expressly found, "said residence is the community property of the parties."

The court found that the parties purchased the property for $395,000 and that they made a $151,000 down payment. R.W. contributed $23,028.13 in separate property funds and G.C. contributed $112,431.47 in separate property funds toward the down payment. Community funds were used for the remainder of the down payment. The community took out a loan for $250,000. The fair market value of the marital residence at the time of the trial was $510,000, which included gross distributable equity in the amount of $265,411.01. The court found that, as a result of the 2012 refinancing, the mortgage on the marital residence was placed in G.C.'s name, but that "[t]itle remained joint."

The court further found that the appreciation in the value of the property was $115,000 and that, "[G.C.] is entitled to 28.47% of the increase in value of the real property based on his separate property contribution of $112,431.47 to the down payment, or $32,740.45." The court also found, "[R.W.] is entitled to 5.83% of the increase in value of the real property based on his separate property contribution of $23,028.13 to the down payment, or $6,705.88."

24

2. *Governing law*

　　a. *Prior law under* Lucas

In *Lucas,* the Supreme Court considered "the proper method of determining separate and community property interests in a single family dwelling acquired during the marriage with both separate property and community property funds." (*Lucas*, *supra*, 27 Cal.3d at p. 811.)  In *Lucas*, a husband and wife purchased a single-family residence during their marriage and took title to the property as joint tenants.  (*Ibid.*)  The wife used her separate property for the down payment, and the couple assumed a loan for the remainder of the purchase price.  (*Ibid.*)

The *Lucas* court noted that, pursuant to former Civil Code section 5110, a single-family residence held in joint tenancy was presumed to be community property at dissolution.  (*Lucas*, *supra*, 27 Cal.3d at p. 814.)  The *Lucas* court held that in order to rebut this presumption, a spouse claiming a separate property interest was required to show an "agreement or understanding" that the spouse's separate property contributions to the acquisition of the property would remain separate property.  (*Ibid.*)

Applying this law, the *Lucas* court noted that, although the trial court had found that the wife did not intend for her separate property used for the down payment to constitute a "gift" to the husband (*Lucas*, *supra*, 27 Cal.3d at p. 815, see also *id.* at p. 812), there was no evidence of an "agreement" that the wife would retain a separate property interest in the house.  (*Id.* at p. 815.)  The *Lucas* court thus reversed the trial court's award of a separate property interest in the property to the wife.  (*Id.* at pp. 812, 815.)

25

The *Lucas* court remanded the matter to the trial court for further proceedings and stated that if the trial court were to find that the residence was entirely community property on remand, the wife would be barred from seeking any reimbursement for her separate property contributions to the property, absent an agreement providing for such reimbursement. (*Lucas*, *supra*, 27 Cal.3d at p. 816.) The *Lucas* court explained that a spouse who uses separate property for community purposes during marriage is presumed to have intended a gift to the community. (*Ibid.*)

The *Lucas* court also provided a formula for the trial court to apply in the event that the trial court were to find that there "was an understanding or agreement that [wife] was to retain a separate property interest in the residence." (*Lucas*, *supra*, 27 Cal.3d at p. 816.) In that instance, the *Lucas* court explained, "[T]he spouse who made the separate property down payment [obtains] a separate property interest in the residence in the proportion that the down payment bears to the purchase price; the community acquires that percentage of the residence which the community loan bears to the purchase price." (*Ibid.*) The spouse's separate property interest should include an amount that "represents the amount of capital appreciation attributable to the separate funds." (*Id.* at p. 816, fn. 3.)

b. *Current law*

"The Legislature enacted several statutes in response to *Lucas*, including provisions governing . . . ownership of jointly titled property, and reimbursement of the contributions to acquire property." (*In re Marriage of Bonvino* (2015) 241 Cal.App.4th

26

1411, 1427 (*Bonvino*).)[18]  With respect to the ownership of jointly titled property, the

Legislature enacted former Civil Code section 4800.1 (current section 2581).  While,

under *Lucas*, the joint title community property presumption could be overcome by an

*oral agreement* or *understanding* (*Lucas*, *supra*, 27 Cal.3d at p. 816), under section 2581

only a *writing* may be used to rebut the presumption.  The *Bonvino* court described the

change as follows:

> "The Legislature . . . changed the rule that a spouse could rebut the
> presumption of community property for a joint tenancy residence
> with evidence of an oral agreement that it was separate property.
> [Citation.]  In 1983, the Legislature enacted Civil Code former
> section 4800.1, now Family Code section 2581, which expanded the
> joint title presumption of Civil Code former section 5110 for single-
> family residences to all property acquired during marriage in joint
> form.  [Citation.]  Under section 2581, property acquired in joint title
> during marriage is presumed to be community property upon
> dissolution.  The presumption of section 2581 may be rebutted only
> by a clear statement in the title document or proof of a written
> agreement that the property is separate and not community property.
> (§ 2581.)  'The requirement of a writing provides a reliable test by
> which to determine the understanding of the parties.  It seeks to
> prevent the abuses and unpredictability that have resulted from the
> oral agreement standard.'  [Citation.]"  (*Bonvino*, *supra*, at pp. 1430–
> 1431.)

Section 2581 provides:

> "For the purpose of division of property on dissolution of marriage
> or legal separation of the parties, property acquired by the parties
> during marriage in joint form, including property held in tenancy in
> common, joint tenancy, or tenancy by the entirety, or as community
> property, is presumed to be community property. This presumption

---

18     The Legislature adopted the two provisions relevant to the issue presented in this appeal, former Civil Code sections 4800.1 and 4800.2, current sections 2581 and 2640, in the same statute in 1983.  (See *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 914 (*Walrath*).)

is a presumption affecting the burden of proof and may be rebutted by either of the following:

"(a) A clear statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property.

"(b) Proof that the parties have made a written agreement that the property is separate property."

The Legislature also abrogated the *Lucas* court's holding that "separate funds used to acquire a community asset were a gift to the community unless the party could prove an agreement otherwise" through the adoption of former Civil Code section 4800.2 (current section 2640). (*Bonvino*, *supra*, 241 Cal.App.4th at p. 1431; see *Walrath*, *supra*, 17 Cal.4th at p. 914 [noting that legislative history of former Civil Code section 4800.2 "expressly states that [statute] was enacted to 'reverse[ ] the rule of [*Lucas*, *supra*, 27 Cal.3d 808], and cases following it, which precluded recognition of the separate property contribution of one of the parties to the acquisition of community property, unless the party could show an agreement between the spouses to the effect that the contribution was not intended to be a gift' "].)

Section 2640 provides "a limited reimbursement of separate property contributions as part of the division of the community estate . . . ." (*Bonvino*, *supra*, 241 Cal.App.4th at p. 1431.) The statute provides in relevant part:

"(a) 'Contributions to the acquisition of property,' as used in this section, include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property.

28

"(b) In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and may not exceed the net value of the property at the time of the division."

Any reimbursement ordered pursuant to section 2640, subdivision (b) may *not* include an amount for appreciation. (See *Bonvino*, *supra*, 241 Cal.App.4th at p. 1432 [amount reimbursed under section 2640, subdivision (b) "does not include interest or appreciation"].) "[A]ny appreciation in the value of a community asset above the amount of the separate property contributions to that asset belongs to the community." (*Walrath*, *supra*, 17 Cal.4th at p. 924.)

### 3. *Standard of review*

Since the relevant facts are undisputed, and the issue on appeal turns on whether the trial court properly applied the law governing the characterization of assets upon dissolution, we apply the de novo standard of review. (See *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 ["[d]e novo review is appropriate where resolution of 'the issue of the characterization to be given (as separate or community property) . . . requires a critical consideration, in a factual context, of legal principles and their underlying values, the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law' "].)

### 4. *Application*

We agree with R.W. that the trial court did not find that the joint title community property presumption contained in section 2581 was rebutted. There is nothing in the trial court's statement of decision that suggests that the court made such a finding. On the contrary, the court expressly found both that the parties acquired the property as joint tenants during the marriage and that the property was community property.

Nor is there any evidence in the record of a *writing* sufficient to rebut the presumption set forth in section 2581. Accordingly, since G.C. did not "retain a separate property interest in the residence" (*Lucas*, *supra*, 27 Cal.3d at p. 816), the trial court erred in applying the *Lucas* formula for calculating "separate and community interests" in the property. (*Ibid.*) Specifically, the court erred in awarding G.C. an amount that "represents the amount of capital appreciation attributable to the separate funds." (*Id.* at p. 816, fn. 3.)

In the absence of the rebuttal of the section 2581 presumption, the court was required to find that the marital residence was community property. G.C. and R.W. were each entitled to *reimbursement* pursuant to section 2640 for their separate property contributions to the acquisition of the residence. However, reimbursement awarded pursuant to section 2640 may *not* include any amounts attributable to appreciation.[19] (See, e.g., *Bonvino*, *supra*, 241 Cal.App.4th at p. 1432.) Therefore, on remand, the trial

---

[19] G.C. does not argue that he is entitled to any portion of the appreciation in the value of the property as a reimbursement under section 2640.

30

court shall divide the value of the appreciation of the marital residence evenly, as a community asset.

We are not persuaded by G.C.'s assertion, without record citation, that "the evidence at trial demonstrated the parties' *understanding* that the marital residence was to be [G.C.'s] separate property." (Italics added.) Even assuming the existence of such evidence in the record, in the wake of the adoption of section 2581, any such "understanding" on the part of the parties would not be sufficient to defeat the community property presumption contained in the statute. (See, e.g., *In re Marriage of Buol* (1985) 39 Cal.3d 751, 755 ["Under [former Civil Code section 4800.1[20]] the only means of rebutting the presumption that property acquired during marriage in joint tenancy is community property is by providing evidence of a written agreement that the property is separate property"].)

We are not persuaded by G.C.'s contention that "[u]nder *Lucas*, the joint title presumption of community property was rebutted." The Legislature adopted section 2581's predecessor statute (former Civil Code section 4800.1) "for the purpose of changing the rule in *Lucas.*" (*In re Marriage of Neal* (1984) 153 Cal.App.3d 117, 123; *In re Marriage of Kahan* (1985) 174 Cal.App.3d 63, 68 ["while under *Lucas* an agreement rebutting the presumption may be proved from the circumstances and actions of the parties, [former Civil Code] section 4800.1 [current section 2581] now requires a writing, either in the deed or as a separate agreement"]; see Hogoboom, *supra*, [¶] 8:425, p. 8-157

---

20    As discussed in the text above, former Civil Code section 4800.1 is currently codified in section 2581.

31

[stating that section 2581 "supersedes *Lucas* in part" and explaining that "[w]hereas under *Lucas*, title presumptions may ordinarily be overcome by an oral agreement or understanding or by implication from a statement or conduct . . . only a *writing* suffices to counter the §2581 presumption" (boldface omitted)].) Even assuming that there was evidence of an "*agreement* or *understanding*" (*Lucas*, *supra*, 27 Cal.3d at p. 815, italics added) sufficient to rebut the community property presumption under *Lucas*,[21] as discussed above, there is no evidence in the record of a *writing* sufficient to rebut the presumption under current law (i.e., § 2581).[22]

The fact that G.C. testified that he was "the only one on the loan,"[23] associated with a 2012 refinance of the property does not demonstrate that he had a separate property interest in the marital residence. G.C. acknowledged that the home remained deeded to both G.C. and R.W., and the trial court expressly found that, notwithstanding

---

[21]    Aside from referring to evidence pertaining to a 2012 refinance of the property, which we discuss in the text below, G.C. does not identify such evidence in his brief.

[22]    After the trial court issued a proposed statement of decision that awarded G.C. a 28.47 percent interest in the appreciation in the value of the residence based on his separate property contribution to the down payment, R.W. filed a written objection in which he raised the same argument that he raises on appeal. During a hearing on R.W.'s objection, the trial court stated that "the better way [to divide the appreciation] was the *Lucas* case way," and overruled the objection. It is not entirely clear from the court's comments whether the court applied *Lucas* (rather than § 2581) in concluding that the joint title community property presumption was rebutted, or whether the court simply "borrowed" the *Lucas* formula for dividing appreciation without making any determination as to whether the community property presumption had been rebutted. The absence of any mention in the court's statement of decision suggesting that the court found that the joint title presumption had been rebutted suggests the latter. In either case, the trial court erred.

[23]    During the trial, the court asked G.C., "In this refinance, is your name the only one on the loan?" G.C. responded affirmatively.

32

the 2012 refinance, "[t]itle remained joint." Thus, G.C.'s testimony concerning the 2012 refinance does not establish that the section 2581 presumption was rebutted.

We are similarly unpersuaded by G.C.'s argument that R.W. failed to demonstrate prejudice. In support of this argument, G.C. notes that the trial court ordered G.C. to reimburse R.W. for "his separate property interests" in the property and "awarded [R.W.] $50,000 from the equity in the marital residence upon refinancing and . . . an additional equalization payment by [G.C.]." G.C. contends that these amounts were "more than sufficient to reimburse [R.W.] for his separate and community property interests in the marital residence."

To begin with, G.C.'s lack of prejudice argument is fundamentally unsound. The fact that the court awarded R.W. *other* amounts does not cure the prejudice of the trial court failing to properly divide the appreciation in value of the marital residence equally. With respect to the specific awards that G.C. mentions, as discussed above, all of the $115,000 appreciation in the marital residence is community property. Neither G.C. nor R.W. is entitled to any portion of the appreciation as separate property.[24] With respect to the "$50,000 from the equity in the marital residence" that G.C. references, the court's

_____

24    Thus, R.W. is not entitled to the $6,705.88 that the trial court awarded to him as separate property for his "5.83% of the increase in value of the real property based on his separate property contribution of $23,028.13 to the down payment." On remand, the trial court shall ensure that R.W. is not awarded any portion of the appreciation as his separate property. We do not read R.W.'s brief as contending that he is entitled to this amount. Rather, R.W. contends that neither party is entitled to *any* portion of the appreciation of value of the marital residence as *separate* property, and that the entire $115,000 of appreciation is to be divided equally as *community* property. For the reasons stated in the text above, we agree with R.W.

statement of decision is clear that this payment was a "pre-judgment community property division." In other words, the court treated the $50,000 as an "advance" made to R.W. from his eventual share of the community estate. Thus, the award does not render harmless the court's failure to properly divide the appreciation of the marital residence evenly, as a portion of the community estate. Finally, the "equalization payment" that G.C. references reflects the trial court's calculation of the amount that G.C. owed in order to effectuate an equal division of the community estate. By its very nature, such a payment cannot cure the prejudice in failing to include an asset in the community estate. On remand, the trial court will be required to recalculate the equalization payment in light of our direction that the court divide the appreciation in the marital residence equally, as community property.[25]

Accordingly, we conclude that the trial court committed reversible error in failing to divide the appreciation in value of the marital residence equally.

_____

[25] In its judgment, with respect to the division of the community estate, the court stated that G.C. was to receive a net distribution of $128,305.08 and R.W. was to receive a net distribution of $82,500. The court then ordered G.C. to pay R.W. $45,805.08 in order to "equalize the division of community property." Although not discussed by the parties on appeal, it appears that the amount of the equalization payment should have been *one half* of $45,805.08, because that is the amount that would equalize the division of community property.

On remand, the parties may address the appropriate equalization payment in light of our order that the trial court divide the appreciation of the marital residence evenly, as a portion of the community estate. The trial court shall ensure that any equalization payment ordered results in an equal division of community property.

34

C.  *The trial court did not abuse its discretion in declining to award permanent spousal support*

R.W. contends that the trial court "failed to consider all of the true facts in determining the propriety of spousal support, as well as its duration."

Section 4320 contains a list of factors that a trial court shall consider in ordering spousal support.[26] "[T]he ultimate decision as to amount and duration of spousal support

---

[26]  Section 4320 provides:

"In ordering spousal support under this part, the court shall consider all of the following circumstances:
"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:
"(1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.
"(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.
"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.
"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.
"(d) The needs of each party based on the standard of living established during the marriage.
"(e) The obligations and assets, including the separate property, of each party.
"(f) The duration of the marriage.
"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.
"(h) The age and health of the parties.

35

rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion."  (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283.)

R.W. offers two arguments in support of his claim that the court "failed to consider all of the true facts," with respect to its decision not to award permanent spousal support.  First, he contends that "if [the New Jersey] domestic partnership is recognized in California, then the duration of marriage was nearly 8 years," and the court "likely" would have ordered G.C. to pay spousal support for an additional two years.[27]  This argument fails in light of our conclusion that the trial court did not err in concluding that

> "(i) Documented evidence, including a plea of nolo contendere, of any history of domestic violence, as defined in Section 6211, between the parties or perpetrated by either party against either party's child, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party.
> "(j) The immediate and specific tax consequences to each party.
> "(k) The balance of the hardships to each party.
> "(*l*) The goal that the supported party shall be self-supporting within a reasonable period of time.  Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage.  However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties.
> "(m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4324.5 or 4325.
> "(n) Any other factors the court determines are just and equitable."

[27]     Although not cited in his brief, R.W.'s argument is apparently premised on section 4320, subdivision (l), which generally allows courts to order permanent spousal support lasting one-half the length of the marriage in cases involving marriages of short duration. (See fn. 26, *ante*.)

36

the New Jersey domestic partnership was not "substantially equivalent" to a California domestic partnership under section 299.2.  (See pt. III.A, *ante*.)

R.W. also contends that the trial court erred in finding that he was in " 'good health,' " (underscore omitted) in declining to award him permanent spousal support in light of evidence that he:  is HIV positive and takes a cocktail of medications; suffers from deep vein thrombosis, blood clotting problems, and a shoulder injury; and has been on short-term disability previously due to internal bleeding.

At trial, R.W. testified "[m]y health is pretty good."  He also testified that he had been "doing really well with that cocktail of medications" used to treat HIV.

In its statement of decision, in discussing factors relevant to the trial court's spousal support determination, the court stated:

> "[R.W.] is 55 years old.  Although he is HIV positive, he does not have AIDS.  [R.W.] testified he is in good health.  He is able to work a 40-hour work week."

In another portion of its order, the trial court also stated, "[R.W.] is in good health."

In light of the record discussed above, and in particular R.W.'s testimony that his health was "pretty good," we conclude that the trial court did not abuse its discretion in finding that R.W. was in "good heath" in declining to award him permanent spousal support.

Accordingly, we conclude that the trial court did not abuse its discretion in declining to award R.W. permanent spousal support.

37

D. *R.W. fails to present any cognizable legal argument in support of his contention that the trial court "erred in its tracing findings"*

R.W. contends that the trial court "erred in its tracing findings."[28] (Formatting omitted.) In support of this claim, R.W. raises, in cursory fashion, a series of distinct arguments pertaining to various findings in the trial court's statement of decision. R.W. contends that the trial court erred in: (1) finding that an entity, G.C., LLC, was G.C.'s separate property; (2) crediting G.C.'s testimony concerning certain bank errors pertaining to two bank accounts; (3) failing to address a "significant discrepancy" concerning G.C., LLC's 2010 tax return; (4) failing to find that certain promissory notes issued in 2010 payable to G.C. were community property; (5) failing to order reimbursements to R.W. for two bank deposits totaling $2,200; (6) failing to properly apply the "recapitulation" method[29] in tracing funds used to purchase the marital residence; and (7) overestimating the value of R.W.'s retirement account. For the reasons

---

[28]    By "tracing," we interpret R.W. to be referring to evidence used to establish that property was acquired with separate property. (See, e.g., *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1399 ["Property that a spouse acquired during the marriage is community property . . . unless it is . . . *traceable* to a separate property source" (italics added)].)

[29]    "Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823.)

discussed below, we conclude that R.W. has failed to adequately present any of these arguments on appeal.[30]

With respect to the trial court's finding that the community had no interest in G.C., LLC, R.W. fails to discuss all of the evidence that supports the trial court's finding, and asserts, without any record citation, that "[t]he labor by both spouses contributed to the LLC during the marriage should have been calculated as community property." It is well established that an appellant must set forth in its brief *all* of the material evidence relevant to a contention that there is insufficient evidence to support a finding, including evidence supportive of the judgment (see, e.g., *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*)). If the appellant fails to do so, its claim is forfeited. Similarly, all parties must file briefs in which they "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C).) In light of R.W.'s failure to adequately cite to the evidence in the record pertaining to the trial court's finding that G.C., LLC is G.C.'s separate property, we conclude that R.W.'s contention with respect to this finding is forfeited.

With respect to R.W.'s contentions pertaining to G.C.'s testimony concerning bank errors, the purported "significant discrepancy" regarding G.C. LLC's tax return, and the court's use of the recapitulation method, R.W. fails to present a coherent legal argument

---

[30]    R.W. also contends that "[i]f the court finds the date of marriage to be 2004 rather than 2009, the tracing by [G.C.] falls apart entirely because his tracing efforts in evidence do not begin until 2008." This contention fails in light of our conclusion that the trial court did not err in determining the date of marriage to be in 2009. (See pt. III.A, *ante*.)

demonstrating error. " 'Issues do not have a life of their own:  If they are not raised or supported by argument or citation to authority, [they are] . . . waived.'  [Citation.]  It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness.  When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)  In light of R.W.'s failure to coherently discuss the legal significance of the evidence that he refers to in his brief with respect to these three issues with a fully developed argument, we conclude that R.W.'s arguments pertaining to the March 25, 2010 bank error, G.C. LLC's 2010 tax return, and the trial court's use of the recapitulation method are forfeited.

With respect to the 2010 promissory notes, R.W. cites to *no* evidence in the record pertaining to this issue.  With respect to the trial court's failure to order reimbursement to R.W. for two bank deposits totaling $2,200, R.W. fails to discuss the significance of his testimony that he was *unable* to "trace" such deposits with bank records.[31]  With respect to R.W.'s contention that the trial court overestimated the value of his retirement account, R.W. refers to an "Equivest statement in evidence," but fails to provide a record citation for such evidence.  R.W. further fails to coherently describe his purportedly uncontroverted testimony on this issue, which he contends the trial court should have credited.  As a result, R.W.'s arguments that the court erred with respect to these three

---

[31]    In discussing the deposits at trial, R.W. stated, "I don't think I can trace that.  I think all I can do is testify to the court that this money was proceeds from my mother's inheritance, and our verbal agreement was that it go towards the down payment of the house."

issues are also forfeited. (See *Foreman*, *supra*, 3 Cal.3d at p. 881; Cal. Rules of Court, rule 8.204(a)(1)(C).)

Accordingly, we conclude that R.W. fails to present any cognizable legal argument in support of his contention that the trial court "erred in its tracing findings."

E. *The trial court did not exceed its jurisdiction in entering an amended judgment while R.W.'s appeal was pending*

R.W. contends that the trial court exceeded its jurisdiction in entering an amended judgment while this appeal was pending. Specifically, R.W. maintains that the trial court erred in modifying the initial equalization payment that G.C. was ordered to pay R.W. from $40,000 in the original judgment to $28,000 in the amended judgment.

G.C. contends that the trial court had jurisdiction to enter the amended judgment notwithstanding the pendency of the appeal because the original judgment contained a clerical error that did not reflect the court's intent.

R.W.'s claim raises a question of law that we review de novo. (See *Rochin v. Pat Johnson Manufacturing Co.* (1998) 67 Cal.App.4th 1228, 1238 (*Rochin*) [deciding, "as a matter of law," whether trial court exceeded its jurisdiction by entering amended judgment to correct alleged clerical error].)

1. *Factual and procedural background*

In January 2016, the trial court filed a proposed statement of decision directing G.C. to pay an equalization payment to R.W. in the amount of $86,339.09. The proposed statement of decision ordered G.C. to make an initial lump sum payment of $40,000

41

within 30 days of the judgment, and to make a series of 54 monthly payments thereafter to pay off the remainder of the equalization payment.

On February 19, the trial court heard argument on the parties' objections to the court's proposed statement of decision. At that hearing, the court expressed its intention to reduce, by $12,000, the amount that G.C. would be required to immediately pay R.W. as an equalization payment in the division of the community estate. The court explained that, at some future date, the court might determine that G.C. was required to pay the $12,000 or some portion of that amount. The court stated, "I am going to say [in the judgment] that the Court is retaining jurisdiction over the payment of that $12,000 equalization payment . . . ." Shortly thereafter, the following colloquy occurred:

> "[G.C.'s counsel]: You honor, then I would ask, please, when the Court . . . say[s] it's going to retain jurisdiction over the $12,000, does that mean that it will not be paid?
>
> "The court: That means that you don't have to pay it yet.
>
> "[G.C.'s counsel]: So that could be taken out of the -- I think it was $45,000 or something,[32] equalization payment?
>
> "The court: It will be taken out of the equalization payment. I'm not saying [G.C.] doesn't owe that. I don't know that he doesn't owe a portion. Let's say that this really only resulted -- your client files a tax return, and it's $8,000; then he might owe you four, because I was sticking him with the proffer that he offered.[33] So I am not going to order that be paid yet."

---

32    As discussed above, the initial lump sum equalization payment in the proposed statement of decision was $40,000, not $45,000, as stated by G.C.'s counsel.

33    It appears that the court initially ordered G.C. to pay R.W. $12,000 to offset a tax liability that R.W. would incur, given the manner by which the court divided the parties' assets in the dissolution proceeding. The court received information at the February 19 hearing suggesting that R.W. might not incur that tax liability.

42

At the end of the hearing, the court stated that it would "correct the [s]tatement of [d]ecision" in accordance with its rulings and prepare a judgment.

On February 29, the trial court entered a judgment. The judgment did not reduce the equalization payment in accordance with the court's stated intention at the February 19 hearing.

On April 29, 2016, R.W. filed a notice of appeal.

In May 2016, G.C. filed a request for order asking the court to correct the judgment. G.C. requested that the court reduce the total equalization payment and the amount of the initial lump sum equalization payment by $12,000 in accordance with the court's orders at the February 2016 hearing.

R.W. objected to the request on the ground that the pending appeal deprived the trial court of jurisdiction to enter the requested order.

The trial court held a hearing on the request. After reviewing the transcript of the February 19 hearing and hearing argument from counsel, the trial court indicated that the judgment should be corrected in accordance with G.C.'s request because the February 29 judgment did not reflect the court's intentions as stated at the February 19 hearing. In granting the request, the court stated in relevant part:

> "I know what I was indicating because I'm the Court, okay, so I know what I was indicating. [¶] I was indicating that [G.C.] does not pay the 12,000."

On August 3, the court filed an amended judgment. The amended judgment reduced the total equalization payment from the original judgment by $12,000 (i.e., from

43

$86,339.09 to $74,339.09).  The amended judgment also reduced the initial lump sum payment to R.W. on the equalization payment by $12,000 (i.e., from $40,000 to $28,000).

2. *Governing law*

" 'The general rule is that once a judgment has been entered, the trial court loses its unrestricted power to change that judgment.  The court does retain power to correct clerical errors in a judgment which has been entered.  However, it may not amend such a judgment to substantially modify it or materially alter the rights of the parties under its authority to correct clerical error.  [Citations.]' " (*Rochin*, *supra*, 67 Cal.App.4th at p. 1237.)  "The test which distinguishes clerical error from possible judicial error is simply whether the challenged portion of the judgment was entered inadvertently (which is clerical error) versus advertently (which might be judicial error, but is not clerical error)." (*Tokio Marine & Fire Ins. Corp. v. Western Pacific Roofing Corp.* (1999) 75 Cal.App.4th 110, 117 (*Tokio*).)

"It is also settled that '[in] determining whether an error is clerical or judicial, great weight should be placed on the declaration of the judge as to his intention in signing the [judgment].'  [Citation.] . . . 'Where the error is made by the judge it is seldom clear from the record or other extrinsic evidence whether the error is judicial or clerical; i.e., whether (a) he knowingly rendered a judgment without realizing that it was bad in law (judicial error), or (b) inadvertently or by mistake signed findings or a judgment or order which he did not intend to constitute his decision.  The issue is one of the judge's intent, and the best evidence is the judge's own statement, either express or implied from the order of correction.  Hence, where the record permits an inference of clerical error, the judge's

44

affidavit or declaration will be extremely persuasive on appeal.' " (*Bowden v. Green* (1982) 128 Cal.App.3d 65, 71–72 (*Bowden*).)

### 3. *Application*

The transcript of the February 19 hearing unequivocally indicates that the trial court intended to reduce the equalization payment ordered in the proposed statement of decision by $12,000. However, the February 29 judgment failed to reflect the court's stated intent. Thus, the court clearly did not exceed its jurisdiction in modifying the original judgment to conform to its stated intent at the February 19 hearing. (See *Tokio*, *supra*, 75 Cal.App.4th at p.117 [trial court may correct judgment "entered inadvertently"].)

In addition, while less clear, the trial court's response to the following question suggests that the court intended to reduce the *initial* lump sum payment by $12,000 (rather than reducing the duration or amount of monthly payments):

> "[G.C.'s counsel]: So that could be taken out of the -- I think it was $45,000 or something, equalization payment?
>
> "The court: It will be taken out of the equalization payment."

Moreover, the trial court's granting of the request to correct the original judgment and its statement, "I know what I was indicating," supports our conclusion that the trial court's amended judgment constituted the correction of a clerical error. (*Bowden*, *supra*, 128 Cal.App.3d at pp. 71–72 [in determining whether error is clerical, "the best evidence is the judge's own statement, either express or implied from the order of correction"].)

45

Accordingly, we conclude that the trial court did not exceed its jurisdiction in entering an amended judgment while R.W.'s appeal was pending.

F.   *R.W. fails to establish that the trial court abused its discretion by failing to consider the complexity of the case in declining to award R.W. attorney fees*

R.W. contends that the trial court "failed to consider the complexity of this case in its attorney fee ruling."  (Boldface & capitalization omitted.)

An award of attorney fees in a marital dissolution action is left to the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. (*In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1523.)  " ' "[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made.  [Citations.]" ' " (*Ibid.*)

In its statement of decision, in discussing whether to award R.W. attorney fees, the trial court noted that, during the pendency of the matter, the court ordered G.C. to pay $10,000 toward R.W.'s attorney fees.  The court further stated that G.C. had complied with the court's order.  The court also considered the relative incomes of the parties and the court's prior award of temporary spousal support,[34] and observed, "[R.W.] was able to retain a total of four attorneys during the pendency of this matter."  Further, in discussing whether to award attorney fees to R.W., the trial court expressly addressed the complexity of the case, stating:

---

[34]   As noted in the text above, the court declined to award *permanent* spousal support.

46

"[T]he preliminary determination issue presented in this matter[35] was complex and the tracing was intricate. However, [R.W.] provided little assistance in this matter.[36] [¶] [R.W.] presented no expert witnesses during the trial. [R.W.] has the ability to pay all of the reasonable fees and expenses of his attorney and court costs of litigation incurred in this matter. [¶] . . . No additional attorney fees are awarded to [R.W.] from [G.C.]"

The record thus clearly establishes that the trial court considered the relative complexity of the case in declining to award R.W. additional attorney fees. Accordingly, we conclude that R.W. failed to establish that the trial court erred in declining to award him additional attorney fees.

IV.

DISPOSITION

The amended judgment is reversed insofar as the trial court failed to divide the appreciation in value of the marital residence equally, as a community asset. The matter is remanded to the trial court with directions to divide the appreciation in value of the marital residence equally, as a community asset, recalculate an appropriate equalization payment in light of this division of the appreciation, conduct any necessary ancillary proceedings, and to enter a new judgment. In all other respects, the amended judgment is affirmed. Each party is to bear his own costs on appeal.

---

35    The court was referring to the date of marriage issue that we addressed in part III.A, *ante*.

36    R.W.'s trial brief on the date of marriage issue was approximately one and one-half pages, and did not contain any analysis with respect to whether a domestic partnership in New Jersey is "substantially equivalent" to a California domestic partnership under section 299.2.

                                                                    AARON, J.

WE CONCUR:

BENKE, Acting P. J.

GUERRERO, J.